ALABAMA & VICKSBURG RAILWAY COMPANY v. KATE E. KING.

[47 South. 857.]

1. CONSTITUTIONAL LAW. *Constitution* 1890, *sec.* 17. *Private property not to be damaged, etc. Public use. Corporate charters. · Change in general law. Obligation of contracts.*

A railway company which, to meet the demands of its increased traffic, lays additional side tracks on its right of way held under a charter authorizing it to acquire and use the same for all necessary railroad purposes, is liable to the owner of buildings on contiguous land for damages thereto resulting from smoke and vibrations caused by the operation of trains on such side tracks, though the company acquired its right of way before such buildings were erected and when the state constitution forbade, not the damaging, but only the taking of private property for public use without just compensation.

2. SAME. *Due process of law. Constitution of the United States, XIV Amendment. Railroad. Operation. Damages.*

Where a railroad corporation acquired its right of way at a time when the state constitution only required compensation for property *taken* for public use, a subsequent constitutional amendment requiring compensation for property "damaged" was not invalid, as depriving the railroad company of its property without due process of law, in violation of the fourteenth amendment to the constitution of the United States.

3. RAILROADS. *Operation of road. Private nuisance.*

A recovery of damages by the owner of buildings on land contiguous to a railway company's right of way resulting from smoke and vibrations caused by the operation of trains on additional side tracks laid upon such right of way does not, where such smoke and vibrations constitute a private nuisance and physical invasion of such owner's premises, operate to deprive the company of a

vested property interest without due process of law, although it acquired its right of way long prior to the erection of such buildings under a charter authorizing it to use the same for all necessary railroad purposes, and when the state constitution forbade, not the damaging, but only the taking of private property without just compensation.

FROM the circuit court of Warren county.

HON. JOHN N. BUSH, Judge.

Mrs. King, appellee, was plaintiff in the court below; the railway company, appellant, was defendant there. From a judgment in plaintiff's favor the defendant appealed to the supreme court.

The suit was an action for damages alleged to have been suffered by the plaintiff, the owner of dwelling houses, and land in the city of Vicksburg located near the tracks of the defendant railway company. Plaintiff charged in her declaration that by reason of the jarring and shaking of her houses, caused by the rapid running of the trains of the defendant, the plastering in her dwellings had fallen, and the chimneys and foundations thereof had been injured; that on account of soot and smoke from the engines of defendant falling upon her houses, she has been damaged because of dirt and suffocation and the water in her cisterns has been thereby poluted; and because of the unusual noises made by passing trains, switching of engines, whistling, ringing of bells, and violent impact of coupling cars, her property has been diminished in value and depreciated as residence property.

The pleas filed by the defendant set up in substance that the defendant acquired the right of way and was operating its trains over the land adjoining plaintiff's property before the adoption of the constitution of 1890, prior to which no liability existed where private property was merely damaged, and not taken for public use, and that no part of plaintiff's property had been taken. Plaintiff demurred to these pleas, and the demurrer was sustained. The case went to the jury, who awarded plaintiff the sum of $350 damages.

For a companion case to this one see *King v. Vicksburg, etc. Co.,* 88 Miss. 456; 42 South. 204; 6 L. R. A. (N. S. ) 1036; 117 Am. St. Rep. 749.

*Smith, Hirsh & Landan* and *McWillie & Thompson,* for appellant.

The defendant filed two special pleas under which it was proposed to make a wholly different case from that of *King v. Vicksburg Railway & Light Co.,* 88 Miss., a street railway company case. These pleas set up in substance that the appellant acquired its right of way and was operating its trains over the land adjoining plaintiff's property long prior to the adoption in 1890 of the present state constitution, prior to which time no liability existed where private property was merely damaged and not taken for public use, and that no part of plaintiff's property had been taken. The plaintiff demurred to these pleas and her demurrers were sustained. We will discuss the question arising on the demurrers when we come to the consideration of the action of the court below on instructions and in excluding evidence offered by the defendant, for the same question there arises and in a manner more favorable to the appellant, since it may be claimed that the pleas did not go to the whole of plaintiff's declaration which is predicated in one count partly of alleged unlawful acts of the defendant in the operation of its trains.

When the plaintiff rested she admitted that the defendant was the successor of the Commercial & Railroad Bank which had owned the right of way along the front of plaintiff's property, not touching the same, since about 1840 and operated its trains along said property until it was succeeded by the Southern Railroad Company, and the Southern did likewise until it was succeeded by the Vicksburg & Meridian Railroad Company, and the last mentioned road did likewise until it was succeeded by the defendant, the Alabama & Vicksburg Railway Company, some time between 1880 and 1890, that com-

mencing in 1897 the business of the defendant company increased and from time to time it became necessary for it to lay additional tracks *on its right of way* and to put on additional trains to move its increased business, and that it had in accordance with the requirements of the public purchased new cars and engines of modern and improved standard which were operated in the usual way railroads operate their engines and trains, along in front of the property in controversy.

On the objection of the plaintiff these facts were excluded from the consideration of the jury and the defendant excepted. The case before the jury was not, however, changed in any substantial manner by this ruling, for the plaintiff's witnesses had shown that the railroad had been operating over the same right of way since 1870, that about the time mentioned the additional side tracks had been laid down and while heavier engines and cars had come into use and a greater number of trains were operated there was nothing to indicate that the engines and cars were out of the ordinary or that any more trains were run than the increased traffic of the road required.

The defendant moved to exclude all of plaintiff's evidence and the motion was overruled. Defendant then asked for a peremptory charge in its favor which being refused defendant excepted and made such refusal of the court one of the grounds of its motion for new trial.

The charter of the Commercial and Railroad Bank of Vicksburg under which the land occupied by the tracks in question was acquired authorized that corporation to enter upon land, lay out the same, and contract with the owner or proceed to have the same condemned, so as to acquire the right to use, occupy and possess the land so far as may be necessary or useful to the purposes of the railroad. Laws 1831, p. 127; Laws 1833, p. 124; Laws 1836, pp. 119, 120. The wide scope of this franchise was considered by this court in the case of *Ewing v. Alabama & Vicksburg R. Co.,* 68 Miss. 551, and while the question in that case was whether the power to condemn was ex-

hausted by one proceeding relating to the right of way proper so as to preclude a like proceeding afterwards for the condemna- tion of land required for a necessary coal chute, the court com- ments at length on the purpose of the act of incorporation which looked to increased facilities with the future development of the country and the growth of traffic.

The plaintiff in no manner questioned the original taking of the land whether by purchase or condemnation nor that it was also properly appropriated to switching purposes over the nec- essary side-tracks subsequently laid down. Indeed, she had no status that would warrant such an objection, and her whole claim is that the operation of the railroad over these tracks, main and side-tracks, on land legally taken for these and other railroad purposes long before she acquired the contiguous land and erected her buildings, made defendant liable for the result- ing damage to her property.

The taking was before the adoption of the constitution of 1890 at which time compensation had to be made for the taking only of private property for public use and the mere damage to private property gave no right to compensation, and we insist that when the constitution was adopted the right to use the land in question for railroad purposes free from any claim for dam- age based upon such use, was fixed and vested under the act of 1836 and is within the protection of the fourteenth amendment to the federal constitution as property of which the defendant could not be deprived without due process of law. The railway company having taken the land near plaintiff's property was under no liability to any one save the owner, and to him only on account of the taking. In view of the long period the land has been held by the railway company and the absence of any complaint, the owner presumably was settled with and the com- pany discharged from all further claim on account of the use of the land for railroad purposes. It had the right to lay on the land not only its main line but all side-tracks that might become necessary and to operate over them the number of trains then

in use or such additional trains as might become necessary, and
engines and cars of such weight as were then in use or of such
additional weight as improved methods and increased traffic
might demand, without incurring any liability to neighboring
owners whose land was not taken.   Railway companies charged
with a duty to the public to transport such legitimate subjects
of commerce as may be tendered to them for carriage must carry
many as well as few and heavy as well as light commodities and
must provide facilities adequate to meet the demands of the pub-
lic.   It is as absurd to say that they incur liability by using
heavier engines and cars than at first as it would be to say that
they do so by carrying heavier commodities.   *Louisville, etc.
Co. v. Lellyett,* 1 L. R. A. (N. S.) 89, 90, 91.   Franchises and
easements are property and this right to so use its right of way
was property that could not be divested by subsequent state
action whether legislative or constitutional.   *Louisville, etc.,
Ferry Co. v. Kentucky,* 188 U. S. 395.   The court will observe
that in the case of *King v. Vicksburg Railway & Light Com-
pany, supra,* the decisions of this court on the law as it stood be-
fore the adoption of the present constitution are shown to have
denied any compensation to property owners whose land was not
actually taken, and the case turned upon the change extending
the right of compensation to those whose property was merely
damaged made by the present constitution which was controlling
in the absence of any right vested prior to its adoption.   See
88 Miss. pages 486, 487.

This right of the railway company to use its right of way as
it is using it being full and complete under its charter after the
appropriation of the property to railroad purposes, there is
here no case *of a new and additional servitude* such as engaged
the attention of this court in *Railway Co. v. Bloom,* 71 Miss.
247.   In that case the railway company, which had never be-
fore had a track at the point in question, under a municipal
license extended a side track along one of the public streets of
a city in front of the plaintiff's property, after the adoption of

the constitution of 1890, thus subjecting the street to a servitude in addition to that already existing in favor of the public for use as a passage way for vehicles, etc.

The case of *Pennsylvania Railroad Co. v. Miller,* 132 U. S. 75 which counsel for appellee greatly rely on is not in point, as can be very readily shown. In that case there was, as here, a change in the state constitution after the grant of the charter whereby it was provided that compensation should also be made for property damaged, but in that case there had been no previous taking of adjoining property before the change in the constitution, nor, indeed, did the railroad previous to doing the injury go anywhere near the plaintiff's property. The defense was that the change in the constitution impaired the obligation of the contract expressed in the defendant's charter, while the defense here is that the defendant's right to hold and use the property taken for all legitimate railroad purposes free from any claim of damage to neighboring property was full and complete before the change in the constitution, and that this right was property of which, under the fourteenth amendment, it could not be deprived unless by due process of law. If the defendant should proceed now to take property for railroad purposes under its charter, it would be liable to neighboring proprietors for the damage resulting to them because its right as to such owners had not been fixed and vested prior to the adoption of the present constitution altering its charter rights. In such a condition of affairs we would have a reproduction of the *Pennsylvania Railroad's case,* the opinion in which, as shown by the last sentence, and as interpreted in the syllabus makes the change in the constitution relate to "future transactions" or "cases afterwards arising." We do not say that to affect the charter by subsequent legislation is beyond the power of the state as impairing the obligation of a contract, but that the state cannot deprive the defendant of property acquired through past transactions except by due process of law.

The defendant did not deny that the plaintiff had sustained

damage from smoke and vibrations of the earth to which it in some measure contributed, but the commission of a nuisance is plainly negatived by the record, and no recovery can be had on the view that the operation of appellant's engines and cars was so conducted as to constitute a nuisance.          ·   ·

The plaintiff's house is very close to the defendant's right of way and was damaged by smoke and vibrations from the opera. tion of defendant's engines and cars, but after the feeblest effort imaginable to show anything wrong or out of the ordinary in such operation of them the plaintiff admitted in open court that appellant's engines and cars were of modern improved standard and were operated along in front of the property in controversy in the usual way railroads operate their engines and trains.    This means that the engines and trains were lawfully operated unless the court chooses to say, in the absence of all evidence on the subject, that railroads usually operate their engines and cars unlawfully.    The sense in which the word usual was employed manifestly includes the idea that the trains were lawfully operated.    It was an admission which prevented the appellant from going into the question of how its trains were · operated, and an admission by the appellee that they were unlawfully operated would have been no admission at all.    For definition of term "usually" see title "Usually," 29 Am. & Eng. Ency. of Law.    The appellee did not in terms declare upon the commission of a nuisance.    The word nuisance does not appear in her declaration from beginning to end.    She set up the injury sustained by her property and relied substantially on the facts that additional tracks had been put in by appellant and that it also operated more trains and heavier cars and engines than formerly, in respect to which we find the following admission :—

"Commencing in 1897, the business of defendant company increased and from time to time it was found necessary for it to lay additional tracks along its property and to put on additional trains to handle its increased business; that it has, in accordance

with the requirements of the public, purchased new cars and en·gines of modern and improved standard," etc.

It is thus seen that the gravamen of the appellee's complaint was that her property in close proximity to the right of way had been damaged by things that it was admitted the appellant had to do in order to discharge its duty to the public.

We do not believe that this court will hold that because the house of one who builds near a railroad right of way sustains damage as an incident of the lawful operation of trains over the right of way a nuisance has been committed by the railway company for which liability may be imposed.

It is settled law that the annoyance arising from the lawful and ordinary operation of a railroad including smoke and vibrations of the earth, do not constitute a nuisance even though they cause discomfort and depreciation of property. *Hammersmith, etc. R. Co. v. Brand,* L. R. 4 H. L. 171; *Rex v. Pease,* 4 B. & Ad. 30, 24 E. C. L. 17; *Dunsmore v. Central Iowa R. Co.,* 72 Iowa. 182; *Beideman v. Atlantic City R. Co.,* (N. J.) 19 Atl. 731; *Carroll v. Wis. Central R. Co.,* 40 Minn. 168.

A railroad is not a nuisance *per se,* and a railroad company is not liable for annoyances to persons and injurious effects upon property resulting from the ordinary operation of its road under its charter. Elliott on Railroads, Sec. 718 and notes; Pierce on Railroads, 2; Rorer on Railroads, 8; 6 Rapalje & Mack. Dig. 886 (2); *Bell v. Railroad Co.,* 25 Pa. 161, s. c. 69 Am. Dec. 687; *Geiger v. Filor,* 8 Fla. 332; *Hentz v. Railroad Co.,* 13 Barb. (N. Y.) 646; *Drake v. Railroad Co.,* 7 Ib. 508.

Since a railroad company has a chartered right to run its trains, injuries which attend the ordinary transaction of its business, such as the sounding of whistles, rattling of cars and other noises, the emission of smoke, sparks and cinders from locomotives, the vibrations incident to the moving of trains, annoyances from the character and condition of freight transported, and the like, are the necessary concomitants of the use of the franchise granted. *Whitney v. Maine Co. R. Co.,* 69 Me.

208; *Stanton v. Louisville, etc., R. Co.*, 91 Ala. 382; *Morgan v. Norfolk, etc., R. Co.*, 98 N. C. 247; *Costigan v. Penn. R. Co.*, 54 N. J. L. 233 (23 Atl. 810); *Beseman v. Penn. R. Co.*, 50 N. J. L. 235; *Parrott v. Cinn., etc., R. Co.*, 10 Ohio St. 624; *Smith v. Midland, etc., R. Co.*, 37 L. T. 224; *Morton v. Lendon, etc., R. Co.*, 9 Ch. D. 623.

That damage results therefrom does not of itself make an act a nuisance. Those great sources of smoke and vibrations, volcanoes and earthquakes, that in obedience to natural laws inflict widespread disaster are not nuisances. The cause as well as the effect must be considered in determining the fact of a nuisance. In the language of the Cyc. "One who uses his property in a lawful and proper manner is not guilty of a nuisance merely because the particular use which he chooses to make of it may cause inconvenience or annoyance to a neighbor."

It would seem to be beyond controversy that the damage resulting to property adjoining a railroad right of way from the proper and ordinary operation of the railroad is not a nuisance, and by the distinct admission of the appellee it appears that the railroad of the appellant was so operated.

If it be held that the usual way in which railroads are operated is an improper and extraordinary way and that therefore a nuisance was committed by the appellant, our argument is at an end, but it is not allowable to so treat the admission of the appellee.

It has never been contended for the appellant, that it would not be liable for the commission of a nuisance notwithstanding the fact that only by due process of law could there be any deprivation of its right to use the land constituting its right of way, for all legitimate railroad purposes as that right existed upon its vestiture prior to the adoption of the constitution of 1890, when compensation was allowed only where private property was actually taken for public use.

The case of *Baltimore, etc., R. Co. v. Fifth Baptist Church*, 108 U. S. 317, was one where the facts showed the commission

of a nuisance, the instructions were predicated of the commission or non-commission of a nuisance and the finding that a nuisance had been committed was approved, and it is therefore inapplicable to a case where no nuisance can be said to have been committed.

There being no question of nuisance in the case and the opinion of the court being predicated of the assumed fact of a nuisance, the appellant has not only been prejudiced by the application of legal principles inapplicable to the case, but also by the erroneous assumption by this court of the fact of a nuisance whereby the federal question on which appellant relied is, perhaps, eliminated from the case.

There was no question of nuisance before the court, and to make the appellant pay the appellee for the use of its right of way in the proper and ordinary manner in which such property is used by railroads by awarding her damages for the incidental injury to her adjacent land not actually taken, it to deprive it of its property in such right of way as it existed when the right vested prior to the adoption of the constitution of 1890, which could not dispense with due process of law.

The appellee's claim of a right to damages founded on the idea of a physical invasion of her property by smoke, etc., finds no warrant in any of the decisions under the older constitutions of 1832 and 1869, which only allowed compensation where there was an actual taking.

In considering the refusal of the lower court to grant the peremptory charge asked by defendant it is unnecessary to discuss the second count which is predicated of the making of flying switches over the tracks in question and the running of defendant's trains at a greater rate of speed than six miles an hour. The instructions asked by plaintiff and the absence of necessary evidence unite in showing that the making of flying switches and the excessive speed of trains were not relied on and cut no figure in the trial of the case. There is only the feeblest suggestion of any such conduct on the part of those in charge of de-

fendant's trains and even if there was such misconduct, its extent is not shown in any way whatever, nor was there any offer in connection with it of the evidence necessary in any case to make it the basis of recovery. There is absolutely no evidence in the record that the making of flying switches and the excess in the speed of trains over six miles caused more smoke or vibrations than there would have been if the switching was otherwise done or the trains had passed at a less rate of speed. Indeed, there is much ground for believing that the evil complained of would be less in the former case. The casual connection between such misconduct and the plaintiff's damage should have been supported by some satisfactory evidence. The truth of the matter is, the code sections forbidding such practices were never intended to serve the purpose for which the plaintiff invoked them. They were designed solely for the protection of persons and animals on railway tracks, and while they can be made to do duty in many cases they should not be worked overtime.

The peremptory charge for defendant should have been given for the reason that the evidence was insufficient to make out plaintiff's case. There could be no pretense that the defendant incurred damages by operating its cars over the old tracks that had been located and used for many years, and there was no attempt to distinguish the damages arising from this cause from those arising from use of the new tracks. There can be no recovery in such case.

It is also worthy of observation that the plaintiff's claim that one fourth of her damage was caused by defendant rests upon the idea that some of the cars were in the cut in front of her property, according to guess, about one-fourth of the time while the smoke and vibrations from the power house were incessant, but it is not shown that the cars in the cut one-fourth of the time really did one-fourth of the whole damage or were there in such number and were so operated as to afford any reason to believe that they did one-fourth of the damage. The defendant could not have been liable for all of one-fourth of

the damage on the ground that its cars and engines were in the cut one-fourth of the time because the power plant, which was operated incessantly, was contributing to the damage during said one-fourth of the time.   When the acts complained of as causing injury to property are different in character and done by different persons, the time occupied in doing them by each offender, bears no just relation to the *quantum* of damages for which each is liable.   It is settled that where different causes contribute to the damage for some of which defendant is not liable, the burden of proof is on the plaintiff to show the damage from the causes for which defendant is liable as distinguished from other causes.   *Lemly v. Golden Censer Co.*, 16 Ill. App. 457 ; *Priest v. Nichols*, 116 Mass. 401.

If the damage is of such a nature that it cannot be determined with any certainty for what each wrongdoer is responsible it would seem that no recovery should be allowed against either, but whether this be the true doctrine, or not, separate actions should not be maintained against the parties.   If the damages for which each is responsible be indistinguishable as between the two, a recovery against one of the parties should exhaust the remedy, since it could not be afterwards affirmed that the plaintiff had not recovered for the damages occasioned by defendant in the suit against the other party.   Substantial damages can not be recovered for an injury to property, without evidence furnishing a basis for a money estimate.   *Sheedy v. Union,, etc., Works*, 25 Mo. App. 527.

*Hudson & Fox*, for appellee.

This case was thoroughly thrashed out, and all of its various -phases considered by this court in the case of *King v. Vicksburg, etc., Co.*, 88 Miss. 456, which was argued by the present learned counsel for appellant.

The reasoning of the court in the *King case* is so clear and manifestly correct, and supported by a doctrine without dissent, that we must content ourselves with the brief filed in the *King*

.*case* and the opinion delivered in that case, an undoubted authority to justify the court in reaffirming action on this subject. The new authorities now offered by the counsel for appellant, misconceive the real issue; their reason shoots wide of the mark and does not arise to the dignity a great court gives such a question.    To be sure there are cases of *damnum absque injuria,* such as the noise produced by walking on the pavement that cannot be avoided or remedied nor stopped and no damage can be recovered.    The pivotal question is, has there been a physical invasion? if so there is a damage under our constitution and the right arises to recover.

The apportionment of the damages in the case has been most just to both tort feasors.    The jury were told in the case against the Electric Light Company not to allow more than three-quarters of the damages against the electric light company, and in this case if they allowed anything it must not be over one-quarter of the damages, and in our judgment they were conservative in their allowances to both wrongdoers, and the reason of this is, because when the electric plant was on trial it would argue and contend that the railway did it, and when the railway was on trial it would contend that the plant did it, but this theory became too elusive for the jury and they acted upon their judgment under the instructions and testimony, and the suits, though separately brought, were properly instituted. 15 Ency. of Plead. & Pract. 558.

It would seem that the railway company now contends that it has a vested right to shoot smoke and cinders at pleasure, and upon whom it pleases, to the extent of suffocation and driving owners and occupants from their homes, to upset the foundations of houses, and destroy gutters, etc., and yet forbid one to dissent from its action, and now as a last resort, it claims to be protected by virtue of an act of incorporation of the Commercial Bank Railroad Company of Vicksburg, incorporated by the act of the legislature of 1832, and the amendatory acts thereto, because of the fifth section of that act which provides "if the road

cannot agree with the owners of the land, through which they desire the road to pass, a writ of *ad quod damnum* shall be issued from the office of the circuit clerk of the county in which the land lies, commanding the sheriff to summons the jury to assess the damage suffered by such owner for reason of making said road through the land, and use such land for the purpose of said railroad."

Mississippi Constitution, 1832, Art. 1, Sec. 13, provided, "Nor shall any person's property be taken or applied to public use, without the consent of the legislature, and without just compensation being first made therefor." Section 14 provided, "That all courts shall be open and every person by an *injury* done him, or *his land or his goods or his person or his reputation,* shall have a remedy by due course of law, and right and justice administered without sale, *denial,* or dely."

Therefore whatever power this railroad company received to deal with the right of the others, it received it with the limitation embraced in the constitution of 1832. But admitting that the constitution is silent upon the subject; then if that right is not plainly and emphatically expressed and given by the law, and in the charter, by which it lives, then no inference can be indulged in by the railroad, as against the government, or if there is a doubt about what the legislature or the constitution intended, that doubt must be resolved in favor of the sovereignty; otherwise the government would, by implication, soon fritter away its right to live.

The court, in *Pearsall v. Great Northern Company,* 161 U. S. 647, says: "such limitation upon the power of the legislature must be construed in subservience to the general rule that grants by the state are to be construed strictly against the grantees, and that nothing will be presumed to pass except it be expressed in clear, unambiguous language. As was said by Mr. Justice Swayne in *Fertilizing Company v. Hyde Park,* 97 U. S. 569, the rule of construction in this class of cases is that it shall be most strongly against the corporation. Every reasonable doubt

must be resolved adversely. Nothing is to be taken or conceded but what is given in unmistakable terms or by implication, equally clear. The affirmative must be shown. Silence is negation and doubt is fatal to the claim. This doctrine is vital to the public welfare. It is axiomatic in the jurisprudence of this court."

The constitution of 1869, Art. 1, Section 10, reinacted the constitution of 1832, and the constitution of 1890 keeps it alive to this day. The subsequent enactment of the 14th amendment never repealed Art. 10, U. S. Constitution, or the provisions of the state constitutions above cited.

Since we have read the words "taken or applied to public use" in the constitution of 1832, we doubt the soundness of the views announced in the cases of *White v. Yazoo City,* 27 Miss. 357 and *Homochitto River, Commissioners v. Whitney,* 29 Miss. 21, "that individual rights are subservient to the public good;" if, when the court announced this view, it was at the time considering the section 13, of the constitution of 1832, and the reasoning for our position is that the constitution makers couple with the word "taken" the words "applied to"; evidently when the molder of this sentence uses the words "applied to" after the word "taken" they intended any other character of appropriation of private property to public use other than "taken" the word taken is sufficiently comprehensive in itself, needs no further explanation, and to repeat the same words again would be tautology which cannot be imputed the constitution makers, therefore the words applied to in our judgment mean a qualified, conditional or temporary use; many cases of which we can imagine and where there would be no actual "taking."

However this may be, the right to take by expropriation, one man's property for right of way purposes, does not confer a right to damage and destroy another's property, under the most ill-conceived conception of the power to "take." To follow the view of learned counsel for the railroad to its ultimate conclusion, the grant conferred in 1836, would give the road the power

to strike down all future acquisition no matter how lawfully ac-
quired and used if they are adjacent to the road; in other words,
to do business to the exclusion of all others.  Fifty years ago one
could extract stones from adjoining lots by the innocent use of
hammers and picks without physical discomfort to his neighbor,
but now dynamite is used instead, and although the company
had a right by charter to get stone to construct a railroad bed,
what court could hold that it had a right to do so with dynamite
to the extent of jarring the windows out of houses, and knock-
ing them down; although done in the most reasonable way.
When the right of way is condemned on which to operate a train
or when charter rights are obtained the grant by the state does
not guarantee expressly or by implication the road the right to
so revolutionize its method of operation so as to destroy the
property of others, nor indemnify it against future damage.
Fifty years ago neither the people nor the road itself ever con-
templated such a use, nor were the matters ever considered by
the legislature or the owners any more than we thought of tak-
ing pictures by electricity one thousand miles away.  When
this road and others in Mississippi, were first put in operation
it used wood for fuel as is judicially known to this court; they
also used a returning draft in their boilers and high smoke
stacks so as to destroy the wood sparks and so as not to ignite
others' property.  Now they use coal and the live voluminous
sparks fly like sky-rockets out of the smoke stack, and shower
down upon the adjacent property and yet appellant's counsel
would urge upon the court that such acts were protected by the
legislative grant of 1836.  It takes an all-wise God to fore-
know a subsequent development of destructive science; and not
the legislature.  When the road was operating with wood per-
sons felt no apprehension from sparks and built houses near the
track, but subsequently, when the railway began to use coal and
haul heavier cars and longer trains and to employ larger engines
and more steam, making the draft so great in the engines, not-
withstanding the best spark arrester, that they flung sparks and

set houses on fire and burned them up.   Would the company be protected by the acts of 1836 ?   The legislature by such acts does not, and never did intend such a grant and especially to protect the road in any future injury it might do.   The great trouble with the road's case here, is that while fifty feet of right of way was enough in 1836, it is not enough now, because it, by its own act, has installed new methods of operation, and because their right of way has not grown with their operations is no reason why it should blame the law or think the demand an unjust one.   The road never offered any proof to show it was using coal or breaking up the foundation of plaintiff's houses by jarring in 1832, or 1890, and the burden was on it to do this, and if it did not the presumption is that it was not and it did not begin until the time of which complaint is made, subsequent to the constitution of 1890.

In *Baltimore & Potomac Railroad v. Baptist Church,* 108 U. S. 739, the church enjoined the action of the railroad company rather than to sue for damages and it will be observed that this decision was rendered in the face of the Federal constitution which provides "for taking" only; and it will be further observed that this road was incorporated in the District of Columbia, by the acts of Congress, and the court says: "Grants of privileges and power to corporate a body like those in question confer no license to them in disregard of the private rights of others and with immunity of their invasion.

The great principle of the common law is equally the teaching of Christian morality, so to use one's property as not to injure others forbids any other application or use of the right conferred.   Whatever consequential annoyance may necessarily follow from the running of cars on the road with reasonable care is a *"damnum absque injuria"*; the private inconveniences in such cases must be suffered for the public accommodation.

But the case at bar is not of this nature.   It is a case of the use by the railroad company of its property in such an unreasonable way as to disturb and annoy the plaintiffs in the occupa-

tion of its church to an extent rendering it uncomfortable as a place of worship, it admits, indeed, of great doubt whether Congress could authorize the company to occupy and use any premises within the city limits, in a way which would subject others to physical discomfort and annoyance in the quiet use and enjoyment of their property, and at the same time exempt the company from suit for damages, or compensation, to which individual acting without such authority would be subject under like circumstances. Without expressing any opinion on this point, it is sufficient to be observed that such authority would not justify an invasion of others' property, to an extent which would amount to entire deprivation of its use and enjoyment without compensation to its owner. Nor could such authority be invoked to justify acts, creating physical discomfort, and annoyance to others in the use and enjoyment of their property to a less extent than an entire deprivation, if different places from those occupied could be used by the corporation for its purposes, without causing such discomfort and annoyance.

The acts that a legislature may authorize, which, without such authorization, would constitute nuisances, are those which affect public highways or public streams, or matters of which the public have an interest or which the public have control, the legislative authorization exempt only from liability to suit, civil or criminal, at the instance of the state; it does not affect any claim of the citizen for damages for any special inconveniences and discomfort not experienced by the public at large.

*Pennsylvania Railroad Co. v. Miller,* 132 U. S. 75, is conclusive of this case, and we content ourselves by referring the court to the opinion which is sufficient.

This authority meets the issue squarely without relying on the constitution of 1832, and says that no such right was given or conferred by the charter and this decision was delivered since the adoption of the 14th amendment.

Argued orally by *T. A. McWillie,* for appellant, and by *S. S. Hudson,* for appellee.

WHITFIELD, C. J., delivered the opinion of the court.

This case is very largely controlled by the principles announced in the case of *K. E. King v. Vicksburg Railway & Light Co.*, 88 Miss. 456, 42 South. 204, 6 L. R. A. (N. S.) 1036, 117 Am. St. Rep. 749. That case, among others, settled the proposition that "a corporation cannot claim exemption from liability for a nuisance maintained by it in the operation of an electric railway power plant, whereby private property is damaged, because it is operating under a charter giving the right to do the business." That proposition, and, indeed, the whole question involved in these two cases, is set forth with most masterly and profound ability in the exhaustive note to *Louisville & Nashville Terminal Co. v. Lellyett, Trustee, etc.*, 1 L. R. A. (N. S.) 49 *et seq.* It is said in that note, on page 50, that: "The correct doctrine is best stated in the opinion of the court in *Blanc v. Murray*, 36 La. Ann. 165, 51 Am. Rep. 9, as follows: 'That which is authorized by the legislature, within the strict scope of its constitutional power, cannot be a public nuisance, but it may be a private nuisance; but the legislative grant is no protection against a private action for damages resulting therefrom.' After approving this doctrine, the court further said: 'The doctrine sometimes stated in the elementary works, and which has been held by some courts, that whatever is authorized by a legislature cannot be a nuisance of any kind is exploded.'" To this statement of the law is appended a citation of well-selected authorities, very numerous, and decisive of the proopsition stated.

The chief and almost sole contention in this case is that the charter of this railroad company, and various acts amendatory of it, authorized the construction of this railroad, and the taking of property under eminent domain provisions, at a time when the constitutions, prior to the constitution of 1890, contained the word "taken," but did not contain the words which the constitution of 1890 now contains, "or damaged;" that this railroad company exercised the right of eminent domain, and

paid for all the property taken under the old constitutions; that this railroad was constructed with all proper care, and has been used since strictly in accordance with the law, all due skill and care in its use having been observed; and that consequently to allow the appellee to recover as against the railroad, under its charter and statutes amendatory thereof, for damages to the property not taken, is a violation of the fourteenth amendment of the constitution of the United States, because that would be, as is alleged to allow the taking of property without due process of law. It is not contended by appellant that it would be a violation of the contract clause of the constitution of the United States.

Appellant recognizes the soundness of the decision in *Pennsylvania Railroad Co. v. Miller,* 132 U. S. 75, 10 Sup. Ct. 34, 33 L. Ed. 267 *et seq.*, and concedes that to allow such damages to appellee is not to impair the obligation of any contract appellant had, and that proposition is undoubtedly settled by many authorities supporting it in the case cited. In the opinion in the *Miller case* the supreme court of the United States said: "There was no such contract between the state and the defendant, prior to the constitution of 1873, as prevented the subjection of the defendant by that constitution to the liability for consequential damages arising from its construction of this elevated road in 1880 and 1881. Prior to the constitution of 1873 and under the constitutional provisions existing in Pennsylvania before that time, the supreme court of that state had uniformly held that a corporation with such provisions in its charter as those contained in the charter of the defendant was liable, in exercising the right of eminent domain, to compensate only for property actually taken, and not for a depreciation of adjacent property. The eighth section of article 16, of the constitution of 1874 was adopted in view of those decisions, and for the purpose of remedying the injury to individual citizens caused by the nonliability of corporations for such consequential damages. Although it may have been the law in respect to the

defendant, prior to the constitution of 1873, that under its charter, and the statutes in regard to it, it was not liable for such consequential damages, yet there was no contract in that charter, or in any statute in regard to the defendant prior to the constitution of 1873, that it should always be exempt from such liability, or that the state, by a new constitutional provision, or the legislature, should not have power to impose such liability upon it, in cases which should arise after the exercise of such power. But the defendant took its original charter subject to the general law of the state, and to such changes as might be made in such general law, and subject to future constitutional provisions or future general legislation, since there was no prior contract with the defendant exempting it from liability to such future general legislation in respect of the subject-matter involved. This principle is well set forth in the opinion of the justices of the supreme judicial court of Massachusetts, given by them in answer to a question submitted to them by the senate of that commonwealth, in *Re Provident Institution for Savings,* 9 Cush. 604. * * * The provision contained in the constitution of 1873 was merely a restraint upon the future exercise by the defendant of the right of eminent domain imparted to it by the state. By its terms it imposes a restraint only upon corporations 'and individuals invested with the privilege of taking private property for public use, and extends the right to compensation, previously existing, for property taken, to compensation for property injured or destroyed by the construction or enlargement of works, highways, or improvements made or constructed by such corporations or individuals. Such provision is eminently just, and is intended for the protection of the citizen, the value of whose property may be as effectually destroyed as if it were in fact taken and occupied. The imposition of such liability is of the same purport as the imposition of a liability for damages for injuries causing death, which result from negligence, upon corporations which had not been previously subjected by their charters to such liability. * * *

Nor will the exemption claimed from future general legislation, either by a constitutional provision or by an act of the legislature, be admitted to exist, unless it is expressly given, or unless it follows by an implication equally clear with express words. In the present case the statutory provisions existing prior to the constitution of 1873, in favor of the defendant, cannot be properly interpreted so as to hold that the state parted with its prerogative of imposing the liability in question, in regard to future transactions," etc., citing many authorities.

In the opinion of the justices of the supreme judicial court of Massachusetts, to be found in the supplement to 9 Cush., at page 604 *et seq.*, the doctrine is very clearly stated, the court there saying: "No special power or privilege being given in the charter, as to the mode of conducting its business, the corporation managed all its affairs according to the general laws. It took its charter subject to the general laws, and of course, subject to such changes as might be rightfully made in such laws. The legislature, surely, did not guarantee to the corporation that there should be no change in the laws, that the whole system of legislation should remain as it was in 1816. There were at that time no general laws in regard to savings banks, as there were no savings banks. But after these institutions were established, and had become numerous and important, it was within the appropriate power of the legislature to make such general laws for their regulation as the public good might require, and there was nothing in the charter of the institution at Boston to exempt it from the operation of these general laws, and it must, of course, be subject to them in common with all the other similar institutions. The legislature, by giving to the institution in Boston the privilege of being a corporation and of managing its proper business, did not relinquish any power of legislating on all proper subjects of legislation. The institution, at the time it was incorporated, had the right and power, under the general laws, to loan money at six per cent. interest; but there can be no doubt that the legislature could

alter the law, so that the institution could take only four or five per cent. interest. The corporation had power under its charter to hold and dispose of property; but there was nothing in the charter as to the mode, and of course, the property could be held and disposed of only according to the general laws which the legislature might at any time alter, and the corporation would be bound by the alteration. The corporation might indorse and negotiate promissory notes, but only according to the general laws, as there was nothing in the charter on the subject; but the legislature might change the whole law on this subject at any time, or take away altogether by general laws the right to indorse and negotiate notes, and these laws would be binding on the corporation. But it cannot be necessary to extend these illustrations. The legislature cannot be deprived of the power it holds for the public good by any doubtful construction or remote inference." See, also, Cooley's Constitutional Limitations (7th Ed.) p. 810 *et seq.*

In the note to *Gainesville, etc., R. Co. v. Hall,* 9 L. R. A. 299, it is said: "The words 'injured or destroyed' in Const. Pa. 1874, art. 16, § 8, were not designed to change, alter, or limit the nature and effect of corporate contracts, but to impose on those having the right of eminent domain a liability for consequential damages. *Edmundson v. Pittsburg, M. & Y. R. Co.,* 111 Pa. 316, 2 Atl. 404." And see, also, the opinion in the case to which this note is appended. In the note above referred to, in *Louisville, etc., Lellyett,* 1 L. R. A. (N. S.), at page 60, it is said: "The question as to the effect of a legislative charter has arisen most frequently in cases of railroads, and therefore, to get the problem well in mind, the situation with respect to them will be examined. An individual may run a railroad on his own property without being liable for a nuisance to his neighbors, so long as, under all circumstances, it constitutes a reasonable use of the property and comes within the maxim, *'Sic utere tuo ut alienum non lædas.'* If, however, the enterprise is too large for him to handle alone, and he decides

to organize a corporation for that purpose, it is necessary for him to receive the sanction of the state by means of a charter, in order to secure the advantages which incorporation confers. But so far as the running of the railroad is concerned he is in precisely the same situation that he was in before. He now has authority to become an artificial being, and that being has authority to run a railroad; but he must still do it with full regard to the rights of other property holders. If, in addition, he desires to extend his road onto another's property or along a public street, he can secure the right of eminent domain by undertaking to become a public servant; but the authority so given him does not change his relations to his fellow citizens, except so far as he can compel them to surrender their property to him for due compensation, and to submit to whatever nuisance he chooses to create, also for due compensation. In other words, his charter and right of eminent domain have merely guaranteed the right to prosecute the enterprise, but have not relieved him of the duties as to making compensation which would rest upon him in their absence. * * * The charter authority prevents the enterprise from being a public nuisance, but has no bearing on the question of presence or absence of nuisance which is strictly private."

In *Baltimore, etc., R. Co. v. Fifth Baptist Church,* 108 U. S. 317, 2 Sup. Ct. 719, 27 L. Ed. 739, this principle that the railroad company in such case, acting under its charter, and using its road with all due skill and care, may not be liable for a public nuisance, but is liable for a private nuisance, damaging private property, is stated with very great ability by Mr. Justice Field; and, while it is true that in that case the church had owned its premises for ten years before the passage of the act and before the railroad company constructed its road adjoining the church premises, this fact in no way affects the application, generally, of the principle announced. That court, amongst other things, said: "The legislative authorization exempts only from liability to suits, civil or criminal, at the in-

stance of the state. It does not affect any claim of a private citizen for damages for any special inconvenience and discomfort not experienced by the public at large."

In the case of *Georgia R. Co. v. Maddox,* 116 Ga. 64, 42 S. E. 315, was announced the further very correct opinion that the fact that the railroad was constructed before the private citizen built his house in no wise interferes with the private citizen's right to recover damages, due to a private nuisance, caused by a railroad company. The court said, further: "The contention of the plaintiffs that this terminal yard of stations and side tracks was a nuisance because dwellings were erected there before the construction of the yard, and that it could have been located at another point, where there were no residences, without being a nuisance to any one, is without modern legal precedent to sustain it, and is unsound for at least two reasons: That in the first place the terminal yard was located at the terminus of one railroad, on an existing right of way of another railroad, and under statutory power. In the second place it is obvious that, if a terminal yard is a nuisance because located near dwellings, it would clearly be a nuisance wherever it might be put, even in the woods or fields, as soon as the owners of adjacent lands build houses on their land; for the old rule, maintained by some authorities, that coming to a nuisance will prevent a person so coming from making complaint, has long since been exploded. *Georgia R. & Bkg. Co. v. Maddox,* 116 Ga. 64, 42 S. E. 315." This announcement that the old rule, maintained by some authorities, that coming to a nuisance will prevent a person so coming from making any complaint, has long since been exploded, is a most wholesome announcement, to which we heartily subscribe. See, also, *King v. Morris, etc., R. Co.,* 18 N. J. Eq. 397. It is also announced, in the note referred to in 1 L. R. A. (N.S.), at page 84, that "the principle so often invoked by railroad companies and other corporations, in this class of cases, that what the legislature authorizes can never be unlawful, means always only that that principle is

limited to the lawful authorization by the legislature, and the legislature has no power to destroy private property by authorizing the erection of a private nuisance in its vicinity." The legislature cannot now, any more than the king could in the past, shelter under the absurd pretense that "the king and the legislature can do no wrong."

In 5 Barb. (N. Y.) 79, in the case of *First Baptist Church of Schenectady v. Schenectady & Troy R. Co.,* the court said: "On this subject the court said that the defendant was indeed authorized to make the railroad, and to acquire the land necessary for that purpose; that it was also authorized to use the road for the transportation of passengers and freight, but that in the exercise of this authority it was only to be exempt from liability for injuries to others to the same extent as if the railroad had been constructed and used by individuals owning the land, without legislative sanction; that if, either in the construction or use of the road, it committed an act for which an individual, under the same circumstances, would be liable, it, too, must be held answerable for the consequences; that every corporation takes its powers subject to this implied restriction, and any other doctrine would lead to unimaginable mischiefs; and that where, as in this country, corporations are so multiplied and so extensively engaged in the various departments of business, to hold that they may, with impunity, do any act for which an individual would be amenable to justice, would result in the most pernicious consequences."

The argument *ab inconvenienti,* made so often in cases of this kind by railroad companies or other corporations, that if it should be held responsible for damages flowing from a private nuisance, created by it, to one owner, it would be so responsible to every other owner, and consequently would be ruined, is very neatly disposed of by the author of the note above in the following language: "The futility of the reasoning to the effect that the plaintiff should not have his action because every landowner on each side of the track would be entitled to his action, and the

litigants would be numbered by thousands, and that it was questionable whether the running of railroads would be practicable if subjected to such a responsibility, is plainly apparent. As is stated elsewhere, the experience in New York City, in what are known as the *Elevated Railroad cases,* is a perfect answer to any such chop logic as this. The effect of the decisions in those cases was to compel the elevated roads to pay to each and every owner of property on the streets on which the roads were, located, in a thickly settled city, the metropolis of the western hemisphere, for a distance of miles in extent, compensation for the damage to his property by the construction and operation of the road. Notwithstanding all which the roads are still running, and have increased in number, and all are paying extensive profits to their stockholders."

The last case which we propose to cite as establishing this proposition, and which states it with the very greatest clearness, is the case of *Blanc v. Murray,* 36 La. Ann. 165, 51 Am. Rep. 9, in which that court held that that which was authorized by the legislature, within the scope of its constitutional power, could not be a public nuisance, but that it may be a private nuisance, and that the legislative grant was no protection against a private action for damages resulting therefrom, and that the doctrine sometimes stated in the elementary works, and which had been held by some courts, that whatever was authorized by the legislature could not be a nuisance of any kind, was an exploded doctrine. Indeed, we held, through CAMPBELL, Special Judge, in the case of this same party in 88 Miss. 456, 42 South. 204, 6 L. R. A. (N. S.) 1036, 117 Am. St. Rep. 749, above referred to, that if the legislature were to attempt to pass a statute exempting the railroad, or other corporations, from liability for damages for a private nuisance created by such act would be unconstitutional.

We think it must be settled beyond any controversy by these authorities that, whatever exemption the railroad company had under its charter and statutes amendatory thereof from liability

for any public nuisance, it certainly was liable to this plaintiff for the damages caused her by this private nuisance. In fact, the property of the plaintiff was practically destroyed. There was, as was well said in the opinion in 88 Miss. 456, 42 South. 204, 6 L. R. A. (N. S.) 1036, 117 Am. St. Rep. 749, a physical invasion and destruction of her property, so that it could no longer be used as her home. As once before remarked in this opinion, the appellant, abandoning any claim that allowed the plaintiff to recover damages caused by this private nuisance would impair any contract obligation it had, only insists here that to allow the plaintiff so to recover would be to take its property without due process of law. But it must be too obvious for further comment that, since an action for damages caused by this private nuisance is a right inherent in the plaintiff, in such cases, under the maxim *"Sic utere tuo ut alienum non lædas,"* there could not possibly, in any legal or logical sense, be said to be any deprivation of property without due process of law in doing what the law itself authorizes.

There is no merit in any other contention of the appellant.

The judgment is *affirmed.*