INDIAN CREEK DRAINAGE DIST. No. 1 OF QUITMAN, TUNICA, AND PANOLA COUNTIES ET AL. *v.* GARROTT ET AL.

[85 South. 312, In Banc. No. 21254.]

1. WATERS AND WATER COURSES. *Drainage district may divert flood waters upon outside riparian owners on river from which overflow has spilled, without liability.*

    A drainage district, for its protection, has a legal right to reasonably levee against and divert vagrant flood waters upon outside riparian owners on the river from which the overflow waters have spilled and spread generally over the adjacent lands of the basin; the damage resulting therefrom is *damnum absque injuria.*

2. WATERS AND WATER COURSES. *River outlets may be obstructed to restrain vagrant flood waters spreading out from river channel.*

    The principle of "*Aqua currit et debet currere ut currere solebat*" is not applicable to the obstruction of vagrant flood waters which pass through natural outlets of a river and spread over adjoining valley lands; the obstruction and diversion of regular and natural stream waters of the stream obstructed, and ordinary rain and surface waters collected, are within the maxim quoted. Such outlets may be obstructed in restraint of vagrant flood waters spreading out from the river channel.

3. EMINENT DOMAIN. *Constitution does not contemplate compensation for damage without legal injury.*

    Section 17, Const. of Mississippi of 1890, providing that private property shall not be damaged for public use except on due compensation being first made, does not contemplate compensation for damage without legal injury, as within the principle of *damnum absque injuria.*

    ETHRIDGE and COOK, JJ., dissenting.

APPEAL from the chancery court of Quitman county.

HON. J. G. McGOWAN, Chancellor.

Suit for injunction by T. M. Garrott and others against the Indian Creek Drainage District No. 1 of Quitman, Tunica, and Panola Counties and others. From a decree overruling the motion to dissolve a temporary injunction

theretofore granted, defendants appeal. Reversed, and decree rendered for appellants.

This is an appeal from a decree of the chancery court of Quitman county, Miss., overruling a motion to dissolve a temporary injunction theretofore granted the appellees, restraining and enjoining the appellants from repairing and extending a certain levee system constructed under the provisions of the act under which the drainage district has been organized.

The Indian Creek drainage district No. 1 comprises approximately forty-five thousand acres of land. It was organized on May 26, 1916; commissioners appointed, assessments levied; bonds issued and sold, and the general plans for the work necessary for the purposes of the district were approved by the court. One detail of the plan was the construction of a levee line extending from the northwest corner of the district to the southwest corner and along the entire western side thereof. The district contains lands in Quitman, Tunica, and Panola counties, Miss. The purpose of the levee system was to protect the lands included within the boundaries of the district from waters from the Coldwater river. The amount of the bonds authorized to be issued by the court was two hundred and fifty thousand dollars; of this amount one hundred and thirty-five thousand dollars had been expended in constructing the work in accordance with the plans and specifications; of the sum of one hundred and thirty-five thousand dollars, seventy-two thousand dollars was spent in excavating the various ditches and cleaning out the bayous in the district, and sixty-three thousand dollars was expended in constructing the levee.

During the early spring of 1919 an unusually large amount of water came down Coldwater river and overflowed its banks in a number of places, a portion of which overflow water was dammed up by the levee. The levee line was not entirely completed, and in two places where the work had not been finished the levee broke, releasing

some of the water, and flooding approximately ten thousand acres or land in the district. The levee line is situated from one to seven miles east of Coldwater river, the line touching Coldwater river at its northern end, and, when completed, will touch it at its southern end, Coldwater river making a big bend to the west between these two points. The appellees are all landowners, owning land on the western side of the said levee line, between it and the river, and many also on the western side of Coldwater river.

On account of the great importance of the decision of the questions involved we shall set out the substance of the pleadings in full, so that the case may be understood in its entirety. The proof follows the pleadings.

### THE BILL.

The original bill filed by the appellees describes generally the location and organization of the said drainage district and Coldwater river. They also allege that a large part of the land belonging to complainants is situated between the drainage district and Coldwater river, and that the lands belonging to complainants are much higher and better lands than the lands in the said drainage district; that the lands of complainants prior to the construction of the said levee were high and above overflow, and further allege, in addition to the levee on the western boundary of the said drainage district, there was a levee on the northern boundary of the said district, and on the south side of Coldwater river, which was probably constructed by a small drainage district north of the defendant district, but charge that the said northern levee was in the defendant district and a part of the drainage and protection plan and scheme of the defendant district. The bill further alleges that the overflow waters from Coldwater river escape naturally in a southern and eastern direction, and prior to the construction of said levee the flood waters from said river flowed naturally to the east and south through

the western part of the said drainage district into David
bayou, Burrell bayou, and other bayous in the said dis-
trict, and through the depressions in the land, finally
returning to Coldwater river through Burrell bayou and
through various small bayous and depressions in the
land; that the said levee as constructed crosses and
dams up several natural water courses, among others
Rifle chute, which prior to the construction of the said
levee was and had been for time out of mind the natural
and proper outlet and way of escape for the overflow
waters of Coldwater river, which flowed into Pompey
Lake, and thence east through said chute into David
bayou, and thence in a southerly direction into Burrell
bayou, and returned to said Coldwater river, at the
mouth of said Burrell bayou, several miles south of the
southern line of the said drainage district; that said
Rifle chute was and is a natural water course, with a
well-defined bed and banks, through which the waters
originally and usually, and for time out of mind,
have flowed; that the said chute is completely dammed
up by the levee on the west side of the district, and
that said levee also dammed up a small natural water
course about one-half of a mile south of the said Rifle
chute, through which the flood waters flowed naturally,
and have always flowed toward and emptying into
David bayou, which was and is also dammed up by the
said levee in the same manner in which the said Rifle
chute is obstructed; that the said levee also crosses and
obstructs many other sags and swales and chutes and
depressions through which the flood waters from Cold-
water river have always flowed naturally to the east
and south through the lands now in the said drainage
district, finding its way back into the said Coldwater
river at points to the south; that at the junction of
the said levee on the west of the said district, and said
levee on the north of said district, the said levee crosses
and dams up the said David bayou; that the said north
levee also dams up and obstructs several escapes for

the water of said Coldwater river.   The bill further
alleges that it is the purpose and intention of the said
district to extend the  levee south  to a  point on the
bank of said Coldwater river above  overflow,  and to
repair the breaks in the said levee, and to enlarge and
strengthen the said levee so as to completely prevent the
escape of any of the overflow waters of the said river
to the south and east from the east point of said north
levee to the south point of the said west levee.

The bill further alleges that there has recently been
an overflow of Coldwater river, caused by excessive
rains; that the said overflow was in excess of the usual
annual overflow of the said river, but was by no means
unusual or unprecedented, and was not in excess of
many floods or overflows of the said river which have
occurred in recent years, and was not in excess of the
floods and overflows which are  likely to occur at any
time during the wet season; that because of the exist-
ence of said levee, the waters of the river in said re-
cent overflow were diverted and thrown back upon the
lands of complainants, which had heretofore been en-
tirely above overflow from the said river; that most of
the lands of complainants, which had never theretofore
been overflowed by the river, were entirely inundated
to a great depth, and much of the said lands which had
been previously partially overflowed, and overflowed
slightly, and upon which the water had remained only
for a short time, and had done little or no damage,
was overflowed to a great depth.

The bill further alleges that if the levees are repaired
and completed and strengthened, so as to prevent the
escape of the water, it will so seriously damage their
said lands that they will be practically valueless; that
the said lands so damaged are in a high state of culti-
vation, and are of the best class of delta lands; that
the lands without the district are more valuable than
the lands within the district.

123—Miss. 20.

The bill further alleges that neither the complainants nor the owners of the other lands so affected and damaged by the said levees were parties to the creation and organization of the said district, and had no notice to appear at the organization of the said district, or at any other time, to protect or defend their interests; that complainants did not know of the plan and scheme of the said district to build and construct the said levee, and did not, until the recent flood, above referred to, know of the results or consequences of the construction of the said levees; that there has been no effort to condemn any of the lands of these complainants, or to ascertain, or to allow or pay for such damage; that if defendants are allowed to repair the breaks in the said levee and to extend the said levee and to strengthen and maintain the said levee, the results would be perpetual and continuing, and irreparable injury and damages to the said lands of complainants and to all of the other lands between the said levee and Coldwater river and along and near the west banks of the Coldwater river; that complainants are without any adequate remedy at law, and have no recourse for their protection, except to come into this honorable court.

The prayer of the bill was for an injunction restraining the defendants from repairing the breaks and from extending the levee or strengthening the levee, or any act in connection with said levee which will prevent the escape of the waters of Coldwater river in the usual and proper way, and upon final hearing the court was asked to make a mandatory order, requiring the defendants to remove the said levee, or to so dismantle and destroy the same that it will not cause damage to the lands of complainants. Complainants also asked that the damages to their lands already accrued by reason of the said levee, and all damages that may accrue until the final decree in this cause, may be ascertained in such manner as to the court may seem proper.

THE ANSWER. ·

The defendants (appellants here) filed an answer, admitting the organization of the district, admitting the district was organized for a twofold purpose: (1) Protection of the lands within the district from overflow waters from Coldwater river; and (2) providing an adequate system of drainage for said lands within the district. The answer charges that Coldwater river rises in Marshall county, Miss., and runs in a westward and southward direction for two hundred and fifty miles, being through the hills, and one hundred and twenty miles through what is known as the "delta lands;" that Coldwater river is a comparatively small river, with an average width of about fifty yards, flowing between banks about twenty-five feet high; that the channel of this stream is amply sufficient to contain the ordinary waters of the river, but in time of floods or freshets, owing to the large drainage area of the stream in the hills, its channel is insufficient to hold its flood waters, and such flood waters, passing over its banks spread over the lands both east and west of the river, flooding to various depths according to the flood stage, a body of land from six to eighteen miles in width and about forty miles in length, comprising approximately three hundred and fifty thousand acres of land, all extremely fertile, capable of being put into cultivation and of producing large yields of agricultural crops of every description if drained and protected from these flood waters. Owing to the great fertility of the soil and to the fact that these floods come only once or twice annually, and frequently recede so as to permit the making of crops, many thousand acres of this land have been put into cultivation and homes and villages are scattered over it, and it is intersected by a through line of railroad; that such flood waters do not constitute a part of the channel of Coldwater river, but they become vagrant surface waters with many cross currents,

spreading out in various directions, according to the
levels of the land, broken up by the narrow fringes of
land along either bank, and by higher bodies of land
back from the river, which become islands, and by the
banks of the various bayous and creeks which are higher
than the lands back of them, and become ridges, and all
of said flood waters have a general tendency southward
until they join the river further down.; that within the
past two years two large drainage districts have been
created in the hills, the Hickahala and Arkabutla drain-
age districts, both draining the land embraced in them
into the Coldwater river in the hills, the area drained
by the two districts being about two hundred and sixty
thousand acres; that the formation of these drainage
districts, the system of drains and canals which they
have had dug, draining this vast area into Coldwater
river, has materially increased its flood height, and as a
result a large proportion of the lands in the delta along
the river are affected by its floods, and the necessity
of taking measures to guard against such floods has be-
·come imperative.

The answer further charges that at the time of the
formation of the Indian Creek drainage district No. 1,
which embraces about forty-five thousand acres of land,
about twenty-five thousand acres of same were in cultiva-
tion, but the cultivation of it had always been more or
less precarious and unsatisfactory, owing to the danger
of its being overflowed by Coldwater river, and, for the
reasons stated, this danger was increased, and for the
same reason the clearing up and putting into cultivation
of the woodland in the district, which was capable of
being cleared up and reduced to a high state of cultiva-
tion, was deferred. The Coldwater river leaves the
hills a short distance north of this drainage district,
and, after flowing westward for a short distance, turns in
a southerly direction, and for about thirteen miles flows
southerly at a distance of from one to eight miles from

the western boundary of the district. Whatever may
have been the condition in ages gone by, the lands within
this district have never within the memory of man consti-
tuted a part of the channel of the Coldwater river, but
have been more or less flooded by the vagrant surface
waters, finding their way over the banks of the river, in
flood time, and the lands of the drainage district have
acted as a reservoir for such surface waters while they
were finding their way southward to the river. In con-
sidering the formation of the district, it became necessary
to protect the lands of the district from the flood waters
of the river; without such protection the benefit which
could be rendered the land by the digging of ditches and
canals and cleaning out of natural streams in the district
in order to take off the rainwater was not sufficient to
justify the expense to the landowners, and such land
would have remained partially cleared and poorly cul-
tivated indefinitely; that the levee has been constructed
accordingly to the plans and specifications approved by
the chancellor, so as, while affording protection to the
district, to damage just as little as possible the lands
outside of the district, including the lands mentioned
in the bill of complaint; that while, as defendants are
informed, believe, and state, the question of interference
with surface waters resulting from ordinary rainfall is
not involved in this suit, and there is no complaint in
regard to this made in the bill, yet to show the care
taken and the expense incurred by the district in con-
structing said levee so as not to interfere with or dam-
age the land outside of the district, defendants charge
that better drainage facilities for ordinary surface
water were afforded to all lands lying between the river
and the western boundary of the district than they en-
joyed before the creation of the district, a canal being
constructed in conjunction with the levee from the north-
ern end of the levee southward along the western base of
the levee into a large bayou known as Open Mouth

bayou, which drains into the Coldwater river, said canal having an average width of thirty-eight feet, and being about ten feet deep; that by means of the canal better drainage was afforded to the surface water of the lands adjacent to and west of the district than such lands had before, and ordinary freshets from Coldwater river will be carried off more rapidly and with less damage to the lands west of the district than before. And defendants denied complainants were not advised of the creation of the district, and the plans and specifications therefor; that the general opinion shared in by complainants was that the construction of the levee and canal, instead of injuring their lands, would prove to be a benefit to them; that a number of the complainants have purchased the lands now owned by them since this district was formed and the work begun therein, and none of the complainants ever interposed any objection to the creation of the district or to the construction of said levee.

The answer also charges that the levee intersects no stream or waterway, extending from Coldwater river westward. The answer admits the crossing of Rifle chute and the depression half of a mile south thereof by the levee. The answer charges that neither Rifle chute nor the depression lead out of Coldwater river, but they originate about a mile east of said river; that Rifle chute is not a flowing stream under ordinary conditions, but simply a conduit connecting Pompey Lake, which lies just outside of the district, with David bayou, which lies within the district; that the flow of Rifle chute is from David bayou to the west of Pompey Lake, there being a four-foot fall in the bed of the chute from said bayou to the said lake; that none of the complainants are riparian owners, owning any land on either Pompey Lake or Rifle chute; that neither Rifle chute nor the depression serve to carry off the flood waters of Coldwater river; that the flood waters of said river, having flowed over its hight banks, find their way back, not

through any stream, but in a broad sheet flowing over all of the lowlands and spreading over the district almost in a body. Defendants state they had a right to levee against flood water, and the injury to complainant's lands does not result in any way from the stoppage of any natural water course, but simply in depriving complainants of the use of the lands of the drainage district as a reservoir for the flood waters of Coldwater river; that the damage to complainants' lands was caused by excessive and unusually high flood waters, there being an eight or nine inch rainfall in twenty-four hours. Defendants denied that the complainants advised that any of them were injured by said flood waters by reason of the levee constructed by the drainage district; admitted that the flood waters were raised from five to ten inches by the levee, not because said levee intersected Rifle chute or the depression south of it, but simply because the levee prevented said floodwaters from spreading over the lands of the drainage district and using such lands as a reservoir, and any damage sustained by complainants by the increased flood level was not due to any wrongful conduct on the part of the defendants, but solely due to the efforts of defendants, to protect their lands from the vagrant surface water, and for any such damage defendants are not liable. Defendants admitted that but for the levee some of the flood waters of the river would have found their way through Rifle chute, some through the depression south of Rifle chute, some broadcast over the land, but not appreciably more would have gone through Rifle chute or the depression south of it than through a gap of similar area anywhere in the levee along its entire length. In the answer defendants charge that the lands of the district have very much enhanced in value since the creation of the drainage district, and a great many additional thousands of acres of woodland have been put into cultivation and the cleared land much enhanced in value; and defend-

ants denied that the lands of complainants are greater
in area or greater in value than the lands of the drain-
age district, or that the lands of complainants were
above overflow and would have been unaffected by this
flood water except for the levee of the drainage district,
but, on the contract, state that all of said lands would
have been affected by such flood water except probably a
narrow fringe immediately along the banks of the river;
defendants denied they have built a levee across the
head of David bayou, where it comes out of Coldwater
river, but charged that more than twenty-five years ago
a dam was put across the head of David bayou to pre-
vent such flood waters flowing from the river into the
bayou, and such dam has been continually maintained
ever since, and protects from these flood waters the
land in the northern part of the district immediately
along David bayou, which lands have been cleared and
improved; that they have done nothing toward either
the construction, enlarging or maintenance of this dam,
but they are informed they are entitled to have said
dam remain where it is.

Under agreement of counsel the cause was heard on
affidavits and oral testimony before the chancellor.

The motion to dissolve the injunction was overruled by
the chancellor, to which exception was reserved and
appeal was granted, and from this decree overruling the
motion to dissolve the injunction, this appeal is prose-
cuted.

### THE EVIDENCE.

At a hearing before the chancellor, L. L. Hidinger, a
witness on behalf of the defendants, testified that he was
a hydraulic drainage engineer in charge of the Indian
Creek drainage district No. 1; that it was created to
remove local rainwaters that fall upon the land, and to
protect the land in the district from overflow from Cold-
water river; that two hundred and fifty thousand dollars
of bonds had been sold, of which one hundred and thirty-

five thousand dollars had been expended in construction works, seventy-two thousand dollars of which had been expended in excavating the canals, and sixty-three thousand dollars in the construction of the levees; that forty-five miles of the drainage canals had been dug exclusive of the canal adjacent to the levee, which is known as Borrowpit canal; that the lands within the district are very fertile, being alluvial soil known as delta land; that about five thousand acres had been cleared prior to the formation of the district, and since the formation of the district from nine thousand to ten thousand acres had been cleared. Referring to the levee, Mr. Hidinger states that the levee starts at the high bank of Coldwater river, about three miles northwest of Crenshaw, Miss., in section 35, township 6 south, range 10 west, and extends southwesterly for about three miles; thence due south for four miles; thence southwesterly for about four miles; thence to the east bank of Coldwater river; thence southwesterly along the bank of Coldwater river about one mile. The plan for the district requires that the material excavated for the construction of the levee be taken from the west side, and that Borrowpit be left in such manner as to form a continuous channl. The plan calls for the canal to be constructed along this levee until it reaches Open Mouth bayou, in section 17, township 8 south, range 10 west, and that it shall connect with the bayou so that there will be a continuous channel connecting with Coldwater river. The purpose is to prevent Coldwater river from overflowing the lands of the district. And he further states that the construction of the levee is very vital to a large percentage of the lands in the district; that the canal to the west of the levee varies from thirty-seven to forty feet at the top, and averages about ten feet in depth; that it offers an important outlet for the water falling on the land between the canal and Coldwater river; that Coldwater river is a stream about two hundred and fifty miles in length; fifty per cent. in the hills and fifty per

cent. in the delta; that the river varies in width from one
hundred and twenty-five feet to three hundred feet, top
to top of bank, and in depth from fifteen to thirty-five
or forty feet; that the river is from one to seven
miles from the western boundary of the district; that
the channel of the river will carry off satisfactorily the
ordinary rains, but during excessive rains it is inade-
quate throughout its entire length; that in times of flood,
such as the flood of 1919, the river spreads out and over-
flows the lands, the overflow varying in width from five
to six miles to eighteen or twenty miles; that at a point
near the middle of the district the width of the flood
plain of Coldwater river is from fifteen to eighteen miles,
about eight miles east of the river, and the remainder on
the west side; that Coldwater river is a typical alluvial
stream, that is, the banks of the river being from two to
three feet higher than the lands a mile or so away; that
the flood plain of Coldwater river is composed of broad
flats, with occasional bayous and ridges, the ridges being
cultivated.

Referring to the levee on the north line of the dis-
trict, Mr. Hidinger states that this levee had been built
when he was in the district in 1906; that the removal of
this particular levee so as to permit the flood waters to
run down David bayou would lower the stage of Cold-
water river somewhat, but not a great deal; that no con-
tinuous streams flowing from Coldwater river are cross-
ed by the levee in the entire length of the levee on the
west side of the district; that Rifle chute connects
Pompey Lake and David bayou; that Rifle chute is not
a running stream, merely a conduit between Pompey
Lake and David bayou; that Pompey Lake is a depres-
sion in the flat woods, and has no direct connection with
Coldwater river, the distance between the river and
Pompey Lake at the nearest point being between three-
quarters of a mile and a mile; that Rifle chute slopes
westwardly from David bayou to Pompey Lake; that
there was an unusual railfall in 1919, averaging four and

one-half inches in two days the water passing down the valley more rapidly than usual, and had it not been for the levee, seventy to seventy-five per cent. of the district would have been flooded, that part which would not have been flooded being situated near the hills; that in 1919 the flood water backed against the levee to a height of five to six feet; that no breaks occurred where the levee was wholly completed, but three or four gaps washed out where the levee was incompleted. Mr. Hidinger testified that in his opinion the effect of the levee would raise the flood waters to the west a comparatively small amount, probably less than a foot; that the height of the flood in 1919 was due to the construction of the canals in the Hickahala and Arkabutla districts, situated north of the Indian Creek drainage district; that said two districts drain about two hundred and sixty thousand acres of land, the effect of which was to hasten the water into the valley; that the flood waters of Coldwater river, after they get out of the channel, flow across the country, and if the flood is high enough it goes over the ridges or between, and works through bayous to the flat country; that ordinarily there is no uniformity in the waters; that as to ordinary floods in Coldwater river, the Borrowpit canal will carry off moderate floods much more rapidly, but as to heavy floods the canal is inadequate, and the woods to the west thereof are overflowed; that the drainage between the channel and west of the channel is facilitated and benefited, and as to ordinary floods the land is benefited by the construction of the canal, as the flood waters are taken off more quickly by the ditches; that as it is now constructed the levee causes the least damage, and is in the most favorable location as to the lands without the district; that the levee was constructed under the plans of the Indian Creek drainage district, which were approved by the commissioners and adopted and approved by the court.

Mr. Hidinger further testified that in times of high water the water comes out of Coldwater river over the

banks and through the bayous and openings and depressions in the banks, and spreads out over the country, filling the bayous and lakes, and running over from these bayous and lakes into and over the adjacent country; that the only water course crossed by the levee which connects directly with Coldwater river is Forked Neck lead, running northeasterly from Open Mouth bayou; that Forked Neck lead is a little depression which extends a short distance from Open Mouth bayou, being nothing more than a little depression, and plays out in the woods; that two flats that do not deserve the name of bayou are intersected by the levee, both being mere depressions in the land, and play out in the woods; that no bayou making up and leading out of Coldwater river is crossed by the levee; that Crocket Lake lead, crossed by the levee, extends out as a distinct channel about a quarter of a mile; that Crocket Lake is not a flowing stream, but during high water the water passes out and spreads from this depression; that Crocket Lake ceases to have a distinct channel about one thousand feet from the levee; that the lands between Coldwater river and Pompey Lake are low flat woodlands up to about half of a mile of the river, and then the lands are cultivated. This witness was corroborated by others.

The appellees (complainants below) introduced a great number of witnesses, and established by competent testimony several propositions. They testified that overflows occur frequently from the Coldwater river about every year; that such overflow varied in height, the overflow of 1906 being the highest known to the witnesses until the overflow of 1919, and this was higher in some places and not as high in others as that of 1906; that at the southern end of the levee the overflow of 1919 rose more rapidly than the water had done in previous overflows before the construction of the levee; that the overflow water from the river, after getting over the high

banks of the river or through depressions in these banks, flows eastward toward the lower land back toward the front of the hills and thence in a general southerly direc-. tion toward the river again; that the levee intercepts the flow of this sheet of overflow water for the entire length of the levee, causing it to rise higher at the levee on the west side of it, and protecting the land on the east side of the levee from the flood waters; in other words, preventing the use of the acreage of this levee district as a reservoir for flood waters.

Frequent mention is made of Crocket Lake lead, Mc-Neil bayou, Dry bayou, Coon bayou, Pompey Lake, Rifle chute, David bayou, Open Mouth bayou, and Forked Neck Lake lead, and as to flood waters flowing from a slough adjoining the river near the northern end of the levee through a small ditch into the canal on the western side of the levee. The gist of this testimony is that the levee of the district intersects the two water courses, Rifle chute and Forked Neck Lake lead (David bayou was dammed more than twenty-five years ago at its northern end, this dam having been maintained continuously since). Beginning at the northern end of the district, Crocket Lake lead is a channel extending a few hundred yards back from the river bank, and, to use the expression of E. K. Leach, one of the witnesses for appellees, "it peters out" in the open woods a short distance back from the river edge, and more than one hundred feet west of the levee. McNeil bayou is a bayou which makes out of the river and backs into it west of the levee, and is not affected by the levee. Coon bayou, or Dry bayou, makes out of McNeil bayou, and disappears in the open woods between that bayou and Pompey Lake, no distinct bayou connecting Pompey Lake and Dry bayou. Pompey Lake is a lake situated in the woods something over a mile east of the river bank, not connected with the river. Rifle chute is a conduit about a half of a mile in length, serving

to connect Pompey Lake with David bayou. The slope of the bed of the chute is from David bayou to Pompey Lake. When the river is in flood the flow of the water is from Pompey Lake by Rifle chute to David bayou, that is eastward, as is the flow of all the flood waters of the river. The levee is built across Rifle chute. Open Mouth bayou is a channel into which the canal on the west of the levee empties, thus making a continuous ditch to drain the land lying between the levee and the river, so far as rainwater is concerned. At the upper end of Open Mouth bayou two prongs, one making to the northwest and one to the northeast, the latter known as Forked Neck lead, is crossed by the levee. About half of a mile east of where the levee crosses it this lead disappears out into a flat country. Forked Neck Lake lead and Open Mouth bayou are ordinarily dry channels. In periods of rainfall they serve to drain the water off into Cold-water river. In periods of floods in Coldwater river the water first comes down from above into Open Mouth bayou and the river, and later, as the river gets full, backs up Open Mouth bayou, Forked Neck Lake lead, and spreads out into the open country toward Sledge and the foot of the hills generally, and thence down Burrell bayou into the river. As stated, the two water channels which this testimony shows are intersected by the levee are the conduit leading from David bayou to Pompey Lake, namely Rifle chute, and the little prong of Open Mouth bayou, known as Forked Neck lead, which is intersected by the levee about half a mile west of its course. This testimony shows that not one of the complainants own any land upon Rifle chute, Pompey Lake, Open Mouth bayou, or Forked Neck Lake Lead; that their claims as riparian owners in connection with these so-called bayous are based exclusively upon their interest in the flood waters of Cold-water river by reason of their owning lands on one side or the other of the river at distances of from two to

twelve miles from these water channels. There is no complaint by any witness as to any interference with the flow of rainwater. It seems to be conceded that the plan of the drainage district for carrying off the rainwater falling on the land between the levee and Coldwater river by means of the canal along the west side of the levee is effective, and affords better drainage to this land than it enjoyed before the construction of the levee.

The proof in the case sustains the material parts of the bill sufficiently to present the questions of law involved. Some parts of the answer material to the issues of fact and law are conclusively proven. There seems to be very little conflict in the proof.

*Percy & Percy* and *Holmes & Sledge,* for appellant.

*P. H. Lowrey* and *Brewer & Brewer,* for appellee.

HOLDEN, J., delivered the opinion of the court.

The gist of the complaint of the landowners between the levee and the river and west of the river is: First, that the commissioners of the levee district have no right to levee against vagrant flood waters which have left the channel of Coldwater river and spread over the adjacent lands of the valley, thereby causing irreparable injury by diverting the water upon their lands; second, that if the levee commissioners have such right, then in exercising it they have no authority to obstruct the outlets or natural water courses connecting with the river through which its flood waters pass and spread generally over the lands of the valley, and eventually return to the channel many miles below.

The levee commissioners contend that they have both rights under the law; that the damming against flood waters is a right which includes obstructing outlets of the river. The commissioners claim, however, that

the second right has not been exercised here because the outlets are not connected with the river, are not proper water courses, and that the complainants are not riparian owners. These claims are relatively material, as will be seen later on, but we shall consider the two main questions involved while assuming there is no merit in the latter claims of the commissioners, so we may go directly and definitely to the two very important and decisive points in the case.

On the first proposition we think that when the flood waters left the channel of Coldwater river and spread for miles upon the lands in the basin or adjacent valley, they are to be characterized as vagrant flood waters as distinguished from ordinary surface or rain waters, or regular running stream waters.

The complaint of appellees is not against the obstruction of the latter kind of waters, but it is against the damming of the flood waters that left the river channel and spread indiscriminately for miles over the land in the basin. A portion of these waters were wont to pass out further into the basin through outlets that were obstructed by the levee; therefore we shall now deal solely with vagrant flood waters, against which the levee was built for protection, and which resulted in damaging appellees by diverting them upon their lands.

The question then is, Did the levee commissioners have the legal right to protect the lands in the district by leveeing against these waters, and thus incidentally throwing them upon the owners outside of the district? We think so.

Such diversion of vagrant flood waters, when incident to and reasonably necessary to the effective protection of the lands in the levee district, is within the phrase *"dammum absque injuria."* The damages resulting are without legal injury, and must be borne for the common good. The act causing the damage is done for protection against the common enemy—roaming flood

waters. It is similar in principle to the right to protect from violence against an outlaw who runs amuck, even though a neighbor is incidentally hurt in the exercise of the right.

This doctrine has been approved by our courts before and since the adoption of our Constitution of 1890. We find it expressed in the cases of *Board of Levee Commissieners* v. *Harkleroads,* 62 Miss. 807; *Richardson & May* v. *Levee Commissioners,* 68 Miss. 539, 9 So. 351; *Richardson* v. *Board of Levee Commissioners,* 77 Miss. 518, 26 So. 963; *Kansas City, etc., Railroad Co.* v. *Smith,* 72 Miss. 677, 17 So. 78, 27 L. R. A. 762, 48 Am. St. Rep. 579; *Ham* v. *Levee Commissioners,* 83 Miss. 534, 35 So. 943; *Holman* v. *Richardson,* 115 Miss. 169, 76 So. 136, L. R. A. 1917F, 942.

The principle is also announced and applied by the supreme court of the United States in the cases of *Jackson* v. *United States,* 230 U. S. 1, 33 Sup. Ct. 1011, 57 L. Ed. 1363; *Hughes* v. *United States,* 230 U. S. 24, 33 Sup. Ct. 1019, 57 L. Ed. 1374, 46 L. R. A. (N. S.) 624, and *Cubbins* v. *Mississippi River Commission,* 241 U. S. 351, 36 Sup. Ct. 671, 60 L. Ed. 1041.

The Arkansas court in *McCoy* v. *Board of Directors,* 95 Ark. 345, 129 S. W. 1097, 29 L. R. A. (N. S.) 396, announces and approves this doctrine, notwithstanding it had before it a constitutional provision identical with our section 17 of the Mississippi Constitution of 1890. Section 17, it is true, adds the right to recover for property "damaged" for public use. Such right existed, however, prior to the Constitution of 1890 under statute, but the right to recover damages for the diversion of Mississippi river vagrant flood waters was always denied. See *Richardson Case,* 68 Miss. 539, 9 So. 351, and *Harkleroads Case,* 62 Miss. 807, *supra.*

At all events, our judgment is that section 17, Constitution of 1890, does not contemplate damages resulting without legal injury, as in the case at bar. Section 238

of the Constitution of 1890 merely provides what was already the law as announced in the *Harkleroads Case, supra.* This section, however, does indicate the policy of the state to be that damages are not recoverable on account of diverted flood waters. We do not see why the rule should apply only to riparian owners on the Mississippi river. Where the same conditions exist, similar reasoning would also apply to interior rivers with reference to the right to protect against vagrant flood waters. We think the same rule should and does apply to interior rivers, under the same conditions, in dealing with flood waters. The authorities from other states cited by appellees are not controlling in our state.

Coming now to the second question as to the right to obstruct the outlets or water courses connected with the river, we shall proceed at once to the point.

There is no complaint in this case about obstructing the water courses, and thereby diverting the natural and regular flow of the waters of these channels. But the evil complained of is the obstruction against the vagrant flood waters which would partly pass out upon the valley through these outlets. These water courses or outlets were inactive bayous, sloughs, and depressions which amounted to mere conduits or passageways for foreign flood waters. They were not natural running streams nor regular flowing water courses. It is true some of them contained waters of their own, but it ordinarily flowed in no direction. There was no regular and continuous current in these natural water courses. The levee did not interfere with the flow of their own waters, because they had no flow except that produced by the flood waters from the river. Therefore the levee obstructed only flood waters which at unusual times passed through these outlets or conduits. The principal function of the outlets was to assist in carrying off flood waters which had left the river channel and spread over the outlying lands. These flood waters would pass

partly through these outlets, but the greater portion would spread over the land south and east for several miles, and then finally go back into the river channel. These flood waters did not pursue these outlets and return directly to the river channel through them, but they spread out for several miles over the lands and into the bayous, sloughs, and depressions before returning to the river.

We think the levee commissioners had a right to build the levee across these outlets in order to protect against the flood waters. Such obstruction did not interfere with the natural flow of their own surface or rain water, nor the regular original channel water of these outlets. There was a canal, immediately west of the levee, which efficiently carried off all ordinary surface water. Unless a levee could be built across these depressions and bayous, it would be ineffective for the purpose intended, and protection against the flood waters would be thus denied appellants.

We do not intend to hold, nor to leave the impression, that there can be no recovery for obstructing and diverting the regular flow of natural running streams, or for collecting and diverting surface or rain water to the injury of another. We say that, assuming the water courses in this case are natural water courses from a legal standpoint, still there is no complaint of obstruction of their own flowing waters, and no complaint of obstruction to any other waters of their own, but the case here is against obstructing and diverting vagrant flood waters; and we hold that the law authorized the obstruction of these waters. See cases of *Jackson*, *Hughes*, and *Cubbins, supra.* To illustrate: The channel of Coldwater river could not be obstructed, nor could any of its tributary streams be dammed if of such substantial importance as would result in diverting its own regular flow upon the lands of another. But such is not the case here.

We find from the written opinion of the chancellor who tried this case that his decision in favor of the appellees was controlled, reluctantly, by the *Cannon Case,* 81 Miss. 334, 33 So. 81, and the *Carrier Case,* 103 Miss. 324, 60 So. 326. We think the chancellor construed these decisions too broadly, and gave them an effect beyond that which was in the mind of the court at the time.

The chancellor expresses an opinion that the outlets are natural water courses, and for that reason the levee board had no authority to obstruct them by leveeing across them. This finding of fact will not be ignored; but let us see what the chancellor meant by holding that these outlets were natural water courses such as were involved in the *Cannon* and *Carrier Cases, supra.*

It is true these outlets were natural water courses as distinguished from artificial water courses, but they carried no regular running streams, with a current that carried their own waters in any direction, unless rain or surface waters. We do not understand that one can obstruct the current or flow of water that does not move in some direction. The most that can be said is that these outlets were mere conduits or passageways, with no regular flowing waters, except rain or surface waters, and passed those waters caused by unusual floods of the Coldwater river. Gullies and ditches which are ordinarily dry may be termed natural water courses whose own natural waters could not be obstructed and diverted to the injury of another, under the case of *Ferris* v. *Wellborn,* 64 Miss. 29, 8 So. 165, yet where they are obstructed solely to protect against vagrant flood waters which infrequently pass back out through them from another overflowed stream the rule is different.

The maxim, *"Aqua currit et debet currere ut currere solebat,"* as applied in the *Cannon Case, supra,* has no application to vagrant flood waters; and we do not

think the court had in mind flood waters when it decided
the Cannon Case. The court seems to have held that
Burr bayou, which was obstructed in that case, was a
natural water course, but it also seems clear that the
court considered that—"Burr bayou is a natural water
course, making off from and flowing out from the Talla-
hatchie river, in which the water flowed in a well-defined
natural water course."

It seems that Burr bayou was a running stream which
if dammed up would result in injury to riparian owners
because the regular flow of the stream would be ob-
structed and diverted upon the bordering owners. If
this is a true interpretation of the facts in the mind of
the court in that case, then it will be easily seen that
the bayous and depressions that were obstructed in
the case at bar were a different kind of natural water
course, in that a different character of waters were ob-
structed; therefore the rule there announced is not ap-
plicable in the case before us. If we have correctly
interpreted the Cannon Case, then the Carrier Case is
not in the way here, because that decision seems to
have resulted from following the Cannon Case. We
cannot bring ourselves to believe that the court in either
of these cases, or in the *Hughes Case,* 27 So. 744, was
attempting to deal with vagrant flood waters. The doc-
trine that no recovery can be had for diverting flood
waters upon the land of riparian owners had been so
long established in this state, and the United States
Supreme Court had so ably announced this rule, and
the fact that this question had been so often discussed
and decided with reference to the Mississippi river—
most of these discussions and decisions being in view of
the court when the Cannon and Carrier Cases were de-
cided—leads us to say that the question of protecting
against flood waters was not in the mind of the court
when these decisions were rendered.

In the *Harkleroads Case, supra,* which decision was rendered in 1885, this court said, in substance, that vagrant flood waters are a common enemy of the public, and that no compensation could be allowed to riparian owners who were damaged on account of such waters being thrown upon them by the levee, and that damages were not recoverable for the closing of natural outlets connected with the river, thus recognizing the doctrine of *damnum absque injuria.*

The *Richardson Case,* 68 Miss. 539, 9 So. 351, was decided in 1891 after the adoption of the Constitution of 1890, and announces the rule that damages are not recoverable on account of diverting water upon riparian owners by levee obstruction. This case holds that such damages are occasioned by unavoidable consequences of the situation and the authorized effort to promote the general good, and are to be borne by the damaged party.

The *Smith Case,* 72 Miss. 677, 17 So. 78, 27 L. R. A. 762, 48 Am. St. Rep. 579, establishes the right to protect against flood waters as distinguished from the waters of a stream, thus recognizing the rule giving the right to levee against such waters after they have left the channel of the stream and become a common enemy. This decision was rendered in 1895. See *Ham* v. *Levee Commissioners,* 83 Miss. 534, 35 So. 943; *Holman* v. *Richardson,* 115 Miss. 169, 76 So. 136, L. R. A. 1917F, 942; *Richardson Case,* 77 Miss. 518, 26 So. 963.

The supreme court of the United States has several times followed this principle as announced by our supreme court. We will not quote or discuss these federal decisions, but shall cite them and respectfully recommend their careful perusal. We think these decisions announce sound and logical conclusions, and would be worthy of following even though our court had not already announced the same principle. See the *Jackson Case,* 230 U. S. 1, 33 Sup. Ct. 1011, 57 L. Ed. 1363; *Hughes Case,* 230 U. S. 24, 33 Sup. Ct. 1019, 57 L. Ed.

1374, 46 L. R. A. (N. S.) 624, and *Cubbins Case,* 241 U. S. 351, 36 Sup. Ct. 671, 60 L. Ed. 1041.

The decisions of our court, cited by appellees to sustain their view with reference to obstructing natural water courses, are cases where the waters obstructed and diverted were not vagrant flood waters, but were the natural running waters of the water courses that were obstructed. In some of these cases it appears that it was the obstruction of their own flowing or running stream waters, and in others it was surface or rain waters collected and wrongfully diverted upon another. None of these decisions cited deal with vagrant flood waters that infrequently come and pass from another overflowed stream through the outlet which serves as a conduit to spread the waters upon the adjacent lands of the basin.

The *Cannon* and *Carrier Cases, supra,* come nearest to being in point for appellees, but we have discussed these cases in the light that they were not dealing with the question of defending against vagrant flood waters.

The decisions of other state courts on these questions are very much in conflict, and we deem it unnecessary to discuss them, because our own court, backed up by the United States supreme court, has already settled the questions in our state. However, a recent decision by the supreme court of Arkansas in the *McCoy Case,* 95 Ark. 345. 129 S. W. 1097, 29 L. R. A. (N. S.) 396, is so identical with the case before us that we refer to it as a sound authority upon which to rest.

There is another case, from California, styled *Lamb* v. *Reclamation District,* 73 Cal. 125, 14 Pac. 625, 2 Am. St. Rep. 775, which is so clear and logical in its reasoning we desire to specially cite it for careful perusal. We cannot refrain from quoting a short excerpt from the opinion as follows:

"Wilkins slough is not a channel or fork, continuously carrying a large part, or any part, of the waters of the

Sacramento river. It carries no water at all except 'in times of flood,' and then the amount which it carries, when compared with the volume of water in the river, is insignificant. In fact, it has no original water of its own at all, but is simply a conduit by which occasionally some of the flood waters of the river escape into the lower lands adjoining. This same office is performed by every other low place along the bank; and every other part of the levee could be removed as a nuisance if that part of it which is at Wilkins slough can be so removed.''

We think the lower court erred in overruling the motion to dissolve the injunction, and for such error the decree is reversed, and decree will be entered here for the appellants.

*Reversed, and decree entered here for the appellants.*

ETHRIDGE and COOK, JJ., dissent.

SMITH, C. J. (specially concurring).

I am of the opinion that a landowner has the same, but no greater, right to obstruct the flow of the flood waters of a stream onto and across his land than he has to so obstruct the flow of ordinary surface water; that is, that he has the right to do so for a proper purpose, and in so doing must exercise reasonable care to prevent unnecessary injury to other land. I do not understand counsel for the appellee to seriously contest this right; their principal contention in this connection being that a landowner has not the right, in order to protect his land from the flood waters of a stream, to obstruct the flow of a natural water course running out of or away from the stream. As I understand the record, the levee here in question does obstruct several such water courses, but does not cause any water that

ordinarily flows therein to overflow or in any way dam-
age other land, that being prevented by the flow of such
water through the Borrowpit canal.

When Coldwater river overflows during the occasion-
al, accidental, and extraordinary floods against which
this levee was built to protect the land within the drain-
age district, the water covers all of the land traversed
by the obstructed water courses, and for the time being
they disappear, and aid in carrying off the water only
during the first and last stages of the flood, so that their
obstruction results only in the flood waters of Cold-
water river being caused to cover the land of some of
the appellees at an earlier stage of the flood, and to
remain thereon for a longer time than it would if the
levee had not been built, but the erection by a landowner
of such works as will prevent the overflow of his land by
the flood waters of a stream will, in probably every case
whether a water course is thereby obstructed or not,
cause such flood water to cover other land sooner and
remain thereon longer than it would otherwise. Con-
sequently, the fact that such a result may follow the ob-
struction of a water course furnishes no reason for
denying to a landowner the right to obstruct it when
necessary to prevent the water from overflowing his
land.

Adjacent landowners have for certain purposes the
right to the unobstructed flow of water in a natural
water course, but that the accidental and extraordinary
flood waters of another stream may be thereby conveyed
away to the damage of other adjacent landowners is
not one of such purposes.

That this levee was built by the drainage district,
and not by an individual landowner, is of no conse-
quence, for what the individual landowners have the
right to do separately they have the right to do collec-
tively, and that is what the landowners whose lands

are protected by this levee have done through the instrumentality of the drainage district.

The cases of *Leflore County* v. *Cannon,* 81 Miss. 334, 33 So. 81, and *Quitman County* v. *Carrier Lbr. Co.,* 103 Miss. 324, 60 So. 326, relied on by counsel for the appellees, are not in conflict herewith; for, as pointed out in the opinion in chief, the levees in question in those cases were not built in order to prevent land from being overflowed by the flood waters of a stream, and the damage which the riparian owners there complained of resulted from the obstruction by the levees of the usual and ordinary flow of the water courses obstructed by the levees, which last element of damage, I will here again point out, is not involved in this case. If the complaint of the appellees was that they are damaged because of the obstruction of usual and ordinary flow of the water courses crossed by this levee, a different question would be presented for decision.

The provision of section 17 of our Constitution that "private property shall not be . . . damaged for public use, except on due compensation being first made to the owner or owners thereof, in a manner to be prescribed by law," can afford the appellees no assistance. Damages in the legal sense, and in the light of which rule this provision of the Constitution was adopted, are only such as result from the invasion of a right; and, since the appellants have invaded no right, either public or private, of the appellees in turning back the escaping flood waters of Coldwater river, they have no just cause of complaint.

It follows from the foregoing views that I concur in the reversal of the decree of the court below.

ETHRIDGE, J. (dissenting).

I am unable to concur with my Brethren of the majority, and, believing this case to be one of the most

important and far-reaching decisions rendered by this court in recent years, I desire to state my views of the issues presented and the law bearing thereon.

The chancellor in his opinion says:

"The gravamen of the complaint being: First. That the lands along Coldwater river are higher than the adjacent lands within the drainage district and have never been subject to overflow, and since the construction of the levee that the flood waters of Coldwater river during times of excessive rains have been confined and caused to flow over their lands, subjecting it to inundation, and that the levees thus confining the flood waters of Coldwater river damage their land. The second ground of complaint is that David bayou, Pompey bayou, Open Mouth lead, and other small streams flowed into Coldwater river, and that the district levees have been constructed across these bayous, and have dammed and prevented the flow of the waters to and from Coldwater river through these bayous into the lowlands, and forced them upon the lands of complainants. . . .

"No effort has been made on the part of the district to compensate these landowners complaining here, and who are not in the bounds of the district; indeed the legislature did not seem to have in contemplation this item of damage. The manifest purpose of the construction of these levees across these bayous was to prevent the flow of flood water upon the lands included in and incorporated in the district.

"These bayous are streams through which flow waters into the river from the lands in the district in normal times. In flood times the flow of the water is reverted, and the water flows through these bayous into the drainage district, and thus diminishes the volume and pressure of the water in the channel of Coldwater river.

"These bayous complained of are described as being depressions in the ground, with well-defined banks, water flowed to the river in the winter and rainy season and

dry in the summer time, with a width varying from twenty-five to ninety feet and depth from two to ten feet. This is especially true of the bayous denominated Forked Lake lead and Open Mouth lead, at the points at which the dam was broken by the overflow water, and the main object of the bill seems to be to prevent by injunction the repairing of the broken places in the levee by the district across these bayous. . . . .

"In the case I am now considering, it is clear that the drainage district had never exercised the right of eminent domain. It is clear that there is and will be irreparable damage to the lands between the east bank of the river and the levee constructed by the drainage district; that this damage will be recurrent and continuous. The defendants concede that there is a constantly recurring damage, and they argued the case solely upon the proposition that, the district having a right to build a levee against flood waters, necessarily it would follow that they had a right to dam up these natural outlets or water courses.

"I can see no difference between Bookter bayou as described in the Carrier Case or Burr bayou as described in the Cannon Case and the bayous and leads described in the bill and proof in this case. It may be that the bayous described in this case are not quite so wide, but it is clear that our supreme court intended to apply the maxim as to bayous, 'Water runs and ought to run as it was wont to run.' Every proprietor of the soil through which runs a stream has the right to have the water course run in the natural current without diminution or obstruction."

The record abundantly supports the chancellor's finding and statement of facts with reference to these leads and bayous being water courses. The dam involved in this suit lies on the western side of the drainage district and on the eastern side of Coldwater river, and runs for approximately thirteen miles from north to

south, while the river meanders in such manner as to leave a large amount of territory between the levee and the river, something like forty-five sections of land lying within this bend of the river, and on the west side of the levee or dam was constructed a large canal. The proof shows that at the time the dams broke the flood waters coming down Coldwater river struck this canal at the north, and proceeded at a rapid rate through the canal and overflowed its banks, moving logs and other things on the land, and, according to the witness, traveling at a rapid rate, with a mighty roar, entered Coldwater river at the south of the canal and levee, and flowed upstream as well as downstream, meeting the flood waters some miles up the river, and by means of the obstructions of the bayous and leads, and the deflection of the water as above described, caused the inundation of the tract between the levee and the river, and also caused the river to overflow on the west side to a greater distance and to a greater depth than it had theretofore overflowed, causing great damage to the owners of this property.

According to my understanding of the law of this state as heretofore announced in numerous cases, the right of these property owners whose property was so damaged to recover compensation for their damages is clear, and until this time undoubted. The opinion of the majority unsettles the law heretofore announced, and it is exceedingly difficult to estimate the effect of this decision upon the rights of the citizens; and it will be a wise lawyer indeed who can advise his clients now what the law is or what their rights may be.

Section 17 of the state Constitution of 1890 reads as follows:

''Private property shall not be taken or damaged for public use, except on due compensation being first made to the owner or owners thereof, in a manner to be prescribed by law; and whenever an attempt is made to

take private property for a use alleged to be public, the question whether the contemplated use be public shall be a judicial question, and, as such, determined without regard to legislative assertion that the use is public."

This section of the Constitution received a construction by the supreme court of Mississippi soon after its adoption in the case of *Vicksburg* v. *Herman,* 72 Miss. 211, 16 So. 434, in which the right to recover for damages inflicted upon private property was given a broad and comprehensive meaning and effect. The court rendering this opinion was composed of Cooper, Woods, and Whitfield, each of whom ranks with the ablest jurists of the country. In the course of the opinion the court said on this subject:

"Under our former Constitutions, which provided only for due compensation to the owner for taking private property for public use, it had been long held that, to entitle the private owner to compensation for the taking of his property for public use, there must be an invasion of the property, a trespass upon it, and an appropriation of it to public use. There must have been, formerly, that which amounted to a deprivation of the owner of his property; and merely consequential injuries, resulting from the loss or impairment of some rights incident to the use or enjoyment, there being no invasion of the property itself, were not covered by the constitutional prohibition. Such was the law as understood and applied before the incorporation in the Constitution of the new words we have referred to. The words are without limitation or qualification. They embrace within their inhibition all those attempting to convert private property to public use, artificial as well as natural persons, municipal and other corporations alike; and they cover all damages of whatever character. We are not to suppose that the framers of the new Constitution employed these additional words, all-embracing in their signification and far-reaching in their applica-

tion, aimlessly and unadvisedly. As the law theretofore was, the taking of private property for public use without due compensation to the owner was inhibited, and the rights of the private person sufficiently guarded. But we are bound to suppose that, in the judgment of the framers of the new Constitution, wrongs were committed by those exercising the right of eminent domain for which there was no legal redress, and hardships endured by the citizen for which there was no remedy. The citizen was already protected against the taking of his property for public use without due compensation first made, but there was no protection against injuries to the rights of the owner of private property less than the appropriation of the property itself. To have inserted the words 'or damaged' in the new Constitution, to cover cases already perfectly provided for in the old Constitution, would have been utterly meaningless. The citizen must now be held, under this new provision of our fundamental law, to be entitled to due compensation for, not the taking, only, of his property for public use, but for all damages to his property that may result from works for public use. He is now secured in his property, and his use and enjoyment of his property. The burdens formerly borne by the citizen, resulting from damage done his property by a diminution or destruction of his right to use and enjoy his own, were designed by this new constitutional rule to be placed upon those by whose action the diminution or destruction was wrought.''

Again, on page 216 of 72 Miss., on page 435 of 16 So. the court said:

''The absolute justness of a rule which forbids the invasion and impairment of the citizen's rights to the use and enjoyment of his property, as well as the actual taking of such property without compensation, to our minds, is beyond controversy. The public benefits derivable to the municipality from the losses of the private

property owner, in the taking or damaging of his property for the use of all the citizens of the municipality, should be paid for by the whole body of the corporation, and not by the helpless owner whose property is taken or damaged, as it seems to us, and as the present Constitution plainly declares.''

The court then proceeded to review the authorities construing the words ''or damaged'' in other Constitutions, and, among the authorities considered and reviewed by the court and quoted is the case of *Chicago* v. *Taylor,* 125 U. S. 161, 8 Sup. Ct. 820, 31 L. Ed. 638 et seq. In this opinion by the United States supreme court, construing a provision of the Illinois Constitution worded exactly like our Constitution, after reviewing the decisions of the Illinois court before the adoption of that constitutional provision and after the adoption of it, giving a broad and comprehensive meaning to the words ''or damaged,'' and making it effective as a protection to the citizens whose property had been damaged by public use, embracing consequential and remote damages as well as direct damages, the United States supreme court said:

''We concur in that interpretation. The use of the word 'damaged' in the clause providing for compensation to owners of private property, appropriated to public use, could have no other intention than that expressed by the state court. Such a change in the organic law of the state was not meaningless. But it would be meaningless if it should be adjudged that the Constitution of 1870 gave no additional or greater security to private property, sought to be appropriated to public use, than was guaranteed by the former Constitution.''

In answering in that case the argument, made there as made here, that such construction would be a serious obstacle to public improvements, and would result in crippling or denying such improvements, the court said:

. March, 1920] Indian Creek Drain. Dist. *v.* Garrott. 337

123 Miss.]                    Dissenting Opinion.

"It may be, as suggested by, its counsel, that the present Constitution of Illinois, in regard to compensation to owners of private property 'damaged' for the public use, has proved a serious obstacle to municipal improvements; that the sound policy of the old rule that private property is held subject to any consequential damages that may arise from the erection on a public use without due compensation being constantly vindicated, and that the constitutional provision in question is 'a handicap' upon municipal improvement of public highways. And it may, also, be, as is suggested, doubtful whether a constitutional convention could now be convened that would again incorporate in the organic law the existing provision in regard to indirect or consequential damage to private property so far as the same is caused by public improvements. We dismiss these several suggestions with the single observation that they can be addressed more properly to the people of the state in support of a proposition to change their Constitution."

In the case of *Richardson* v. *Levee Commissioners*, 77 Miss. 518, 26 So. 963, in which case counsel for the appellant in the present case was counsel there, this court, speaking through Judge Whitfield, said:

"The very same section of the Constitution of 1890 (section 17) which provides that 'due compensation' shall first be made to the owner for 'private property taken for public use' provides also that it shall not be 'damaged' for public use without due compensation being first made. The due compensation is, by the Constitution—the supreme law of the land—imperatively required to be first made as well when property is damaged as when it is taken. It is settled by *Vicksburg* v. *Herman*, 72 Miss. 211, that the damages referred to in section 17 embrace all damages, direct or consequential, immediate or remote. The measure of the right secured by this section is thus defined and settled by

this and previous cases in this state, and includes all private property taken and all private property damaged for public use. The remedy by which both rights are to be secured, section 17 declares, is to be prescribed by law. The framers of the Constitution, embracing the very ablest legal talent in this state, then proceeded, as to levee boards to prescribe the remedy, in section 238. It is admitted that that section did prescribe the remedy for due compensation for private property taken; it is denied that it prescribed the remedy for such compensation for damages to such property not taken. It is first to be observed that the argument in support of this denial is based almost wholly on the proposition that the damages are consequential, and hence not such in character as this board of levee commissioners is a fit or competent body to assess. But this objection is ended by *Vicksburg* v. *Herman."*

In *Duncan* v. *Levee Commissioners*, 74 Miss. 125, 20 So. 838, it was held that an owner of land left outside of the levee, while not entitled to compensation for the reason that his land is outside of the levee, is entitled to damages caused by the levee itself, such as the obstruction to the drainage of the land so situated. In the course of the opinion Judge WHITFIELD said:

"All damages, therefore, which accrue to lands from the ravages of the river, because not protected against it by the levee, are not to be compensated for. But damages produced by independent causes, other than being left outside the levee, if in their nature allowable within the rules of law, are still recoverable. Take the case of land so situated—high at the river, with declination and drainage eastward—that the river rarely or never overflows it, and which yields annual crops of great value, yet such, also, in its topography that were the levee built along its eastern base, rainwater, which had theretofore been carried off through natural or artificial drains eastward, would be backed up over it, and destroy its crops.

Manifestly this is not damage accruing because of the lands being left outside the levee, but because of the construction of the levee over lands of that situation and topographical character; damages caused, to put it otherwise, not because the lands were unprotected by the levee, but caused by the levee itself.''

And it was held that Duncan was entitled to damages for the stopping of the water course.

In *Hughes* v. *Levee Commissioners,* 27 So. 744, the court held that, in the absence of proof of public necessity, levee commissioners have no right to proceed with the construction of the levee damming a natural stream and causing the water to flood plaintiff's land, before condemning the same and paying damages therefor. In that case Hughes was the owner of a plantation which was drained by a natural water course named Black bayou, which stream rises on or near the land of Hughes. Appellee's levee crossed this stream and dammed it, causing the water to be ponded against the levee, and, by back flowage, to flood part of his plantation. The levee, however, did not actually touch or run through Hughes' plantation.

In *Corley* v. *Levee Commissioners,* 95 Miss. 617, 49 So. 266, it was held that, where plaintiff's land was overflowed partly because of heavy rainfalls and partly because the works of the defendant levee district obstructed the flow of the water through its natural channels, and the evidence plainly showed that a material percentage of the damage was due to the construction of the levee, a charge that, unless the jury believed the entire damage to plaintiff's crops was due exclusively to the levee, and not at all to the act of God, they should find for defendant, was erroneous, and the case was reversed because of insufficient compensation for the damage done by obstructing this water course.

In *A. & M. R. R. Co.* v. *Beard,* 93 Miss. 294, 48 So. 405, the court again recognized that a party is entitled to dam-

ages where another obstructs a water course.

In *I. C. R. R. Co.* v. *Miller,* 68 Miss. 760, 10 So. 61, it is held that one is liable in damages who collects in artificial channels surface water falling upon his own land or that of others, and discharges it in undue and unnatural quantities upon the land of another.

In *Ham* v. *Levee Commissioners,* 83 Miss. 534, at page 558, 35 So. 943, 948, another drainage case, the court in its opinion, after discussing other questions in the case, has the following to say:

"The sole remaining question requiring consideration is what rights and remedies the complainants have, and how they can be asserted. There is no contention but that they are entitled to due compensation for the value of all property taken and for all damages caused by the erection of the proposed levee, and there is no denial that this must be made before the property is in fact taken. As to this, appellants have a perfectly plain and adequate remedy prescribed by law, and the methods in which their rights may be asserted is clearly set out in section 233 of the Constitution, and section 3 of chapter 168, p. 142, Laws 1884. Nor is the extent of their rights subject to doubt. It is true that they cannot recover damages from the fact alone that their lands are left outside the levee, and are therefore not protected from the high water. Recovery on this ground is expressly forbidden by section 238 of the Constitution. This branch of the subject was most elaborately discussed in *Richardson* v. *Board of Mississippi Levee Commissioners,* 77 Miss. 518, 26 So. 963, and it was there expressly decided that the damages mentioned in section 17 of the Constitution, for which due compensation was to be made, embraced 'all damages, direct or consequential, immediate or remote.' See *Vicksburg* v. *Herman,* 72 Miss. 211, 16 So. 434; *Duncan* v. *Levee Commissioners,* 74 Miss. 125, 20 So. 838. So that appellants have ample protection in existing provisions, not only to prevent the board of levee commis-

sioners from taking any of their property for public use without first fully paying therefor, but to also insure that they will receive due compensation for all damages inflicted, whether such damages are caused by seepage water, damming of surface water, or obstructing of natural drainage, and whether the land affected lies outside or inside of the levee.''

In *Liles* v. *Cawthorn*, 78 Miss. 559, 29 So. 834, this court held: ''Every proprietor through whose land a stream passes is entitled to have it run in its natural state without diminution or obstruction.''

And held that—''When the owner of a water mill so builds the dam thereof as to cause the backwater therefrom to injure the power of a like mill on the same stream, the owner of the latter may treat such dam as a nuisance, and of his own authority enter and remove so much of the same as causes the injury sustained.''

In *Leflore County* v. *Cannon*, 81 Miss. 334, 33 So. 81, it was held that a county without resorting to eminent domain could not obstruct a stream, and the county was enjoined from so doing. Judge Calhoun in this case said:

''Under our Constitution and laws neither municipalities, nor counties, nor the sovereign state itself can damage the humblest individual, in violation of the maxim [''*Aqua currit et debet currere ut currere solebat*''], except in the lawful exercise of the right of eminent domain, and then not without previous compensation, ascertained by lawful methods. This is true regardless of the benefit to the public at large.''

To the same effect is *Board of Supervisors of Quitman County* v. *Carrier Lumber Co.*, 103 Miss. 324, 60 So. 326.

In *Thompson* v. *Railroad Co.*, 104 Miss. 651, 61 So. 596, it was held that a railroad company is responsible for any damage resulting from its obstruction of a natural water course, without reference to whether or not the obstruction was reasonable or unreasonable. In the con-

cluding paragraph of the opinion in this case this court
said:

"In this state it has been held that the railroad must
take care of the flow of the surface water, if to do so
would not result in any danger to traffic, and if this could
be done without incurring an additional expense out of
all proportion to the injury of adjacent lands. From the
necessities of the case, the courts adopted a rule with re-
gard to the flow of surface water applicable to railroads
which would not apply to ordinary landowners. *Sinai* v.
*Railway Co.,* 71 Miss. 547, 14 So. 87. So far as the flow
of water in natural courses is concerned, the railroad com-
pany would be required to answer for any damage re-
sulting from its obstruction of such water courses, with-
out reference to whether or not the obstruction was rea-
sonable or unreasonable. In other words, the obstruction
of a natural water course imposes upon the obstructor the
obligation to answer for all damages flowing from such
obstruction."

In *Learned* v. *Hunt,* 63 Miss. 373, there was a bill filed
for an injunction to prevent obstructing by locks or dams
the natural flow of water through what is known as Isen-
hood bayou. It was alleged that Isenhood bayou was a
natural outlet or drain by which such overflowing waters
of the Mississippi river returned to that river at a point
below, and that if this bayou was closed or obstructed in
any way the water will stand upon the plantation for a
long while and greatly injure them. In the opinion of
the court by COOPER, C. J., it is said:

" 'The character of the injury inflicted upon the
complaintnt's lands by reason of the construction by the
locks and gates placed by the defendants in the stream
by which the overflowing waters of the river are returned
to it, warrants the interposition of a court of equity to
prevent the injury by the writ of injunction."

In the majority opinion, referring to the bayous in-
volved in this suit, it is said: "These water courses or

outlets were inactive bayous, sloughs, and depressions which amounted to mere conduits or passage ways for foreign flood waters. They were not natural running streams, nor regular flowing water courses. It is true some of them contained waters of their own, but it ordinarily flowed in no direction. There was no regular and continuous current in these natural water courses."

While I think the record will show that this statement is inaccurate, and that these are streams through which water flows at certain intervals regularly, still, accepting this statement as true, the majority opinion overthrows the settled law of this state upon the subject of what constitutes a watercourse.

In *Ferris* v. *Welborn,* 64 Miss. 29, 8 So. 165, in the second syllabus on the subject of water courses, it is said: "And a creek which has a channel one-half of a mile long, with definite bed and banks of varying width and depth, through which water is conveyed and discharged into lowlands adjacent to a running stream, though it be dry most of the time, but running when there is water to be carried off by it, is a water course, with all of the incidents thereof."

In the first syllabus of this case it is said: "A riparian owner has the right to have a natural water course which drains his lands adjacent thereto remain unobstructed and as nature made it, in its course onward through the lands of another."

The opinion in this case was rendered by Judge CAMPBELL.

In *Belzoni Drainage Commission* v. *Winn,* 98 Miss. 359, 53 So. 778, it is said: "A natural channel with defined bed and banks of varying width and depth through which water is conveyed and discharged is a 'water course,' and the fact that it is most of the time dry or not running is not enough to deprive it of the character of a 'water course.'"

The opinion in this case was delivered by MAYES, C. J. He quotes Judge CAMPBELL in *Ferris* v. *Wellborn, supra,* and says: "This case was cited with approval in the case of *Rait* v. *Furrow,* 74 Kan. 101, 85 Pac. 934, 6 L. R. A. (N. S.) 157. The question of what constitutes a water course has been a perplexing one for the courts, and there is a varying line of decisions on this subject. It is not our purpose to attempt any reconciliation of the authorities. Under every decision and under every definition, 'all natural drains' must be held to include natural water courses, as well as swales or ravines which might not be held to be water courses."

In the case of *Rait* v. *Furrow,* 74 Kan. 101, 85 Pac. 934, 6 L. R. A. (N. S.) 157, 10 Ann. Cas. 1044, quoted above by Judge MAYES with approval, it is said: "Where water runs in a well-defined channel, with bed and banks made by the force of the water, and has a permanent source of supply, it is to be regarded as a natural water course, although the stream may be small, its course short, and it may have existed for only a short time."

The second syllabus of this opinion says: "The source of supply may be springs, surface water, or a pond formed by surface water; but, whatever the source, if it has the element of permanence, it becomes a natural water course where the water comes to, or collects on, the surface and flows in a well-defined channel and bed, with such banks as will ordinarily confine the water and cause it to run in a definite direction."

In the fourth syllabus it is said: "A stream may be a natural water course, although its outlet be over the unchanneled surface of lowland, and not into another water course."

It will be seen from the Mississippi cases cited, when read in connection with the majority opinion, that the law of waters in this state from the beginning up to now has been unsettled by the decision of this case, and that the course of decisions for the past thirty years, con-

struing section .17 of the state Constitution of 1890, has been put in uncertainty and confusion if they have not been destroyed. The majority opinion deals with the decisions prior to the Constitution of 1890, and those subsequent to it as though the law was not affected or changed by the words "or damaged," inserted for the first time in 1890 in the Constitution of this state.

The *Harkleroads Case,* 62 Miss. 807, and the *Richardson Case,* 68 Miss. 539, 9 So. 351, were constructions of the laws as they existed prior to 1890, when the constitutional provision simply provided that property should not be taken for public use except on due compensation being first made to the owners thereof. The announcement of those cases on the Constitution as it then was is in accord with the weight of authority wherever that provision was in a Constitution.

As shown by the case of *Chicago* v. *Taylor,* 125 U. S. 161, 8 Sup. Ct. 820, 31 L. Ed. 638, the Illinois court, prior to 1870, held in accord with those decisions, but when the Constitution was changed by the insertion of the words "or damaged" after the word "taken" and before the words "for public use," the law was necessarily radically changed. The majority opinion ignores this vital distinction between cases before and after the Constitution of 1890. In the fifth amendment to the Constitution of the United States the provision pertinent to the present question reads as follows: "Nor shall private property be taken for public use without just compensation"—and of course under this provision the decisions of the United States supreme court in *Jackson* v. *United States,* 230 U. S. 1, 33 Sup. Ct. 1011, 57 L. Ed. 1363; *Hughes* v. *United States,* 230 U. S. 24, 33 Sup. Ct. 1019, 57 L. Ed. 1374, 46 L. R. A. (N. S.) 624, and *Cubbins* v. *Mississippi River Commission,* 241 U. S. 351, 36 Sup. Ct. 671, 60 L. Ed. 1041, are proper and correct. But the decision of the United States supreme court in *Chicago* v. *Taylor, supra,* shows with precision

what the United States supreme court would hold were it construing a constitutional provision similar to section 17 of our Constitution.

The chancellor in his opinion well said on this subject:

"There are two lines of authorities in the United States as to control of flood waters by levees. These two distinct lines of authorities are not in harmony, and are diametrically opposed to each other. One line of authorities holds that the party who constructs a levee to protect his land from the overflow waters of a stream must have regard for the rights of his neighbor, and that the overflow waters are a part of the stream which cannot be obstructed without liability for the consequential damage caused by an obstruction. The other authorities are mainly from the states of California and Arkansas, and the supreme court of the United States holds in effect that flood waters are a common enemy, and that the great beneficial results achieved by leveeing against the flood waters renders injury to the other landowners *damnum absque injuria.*"

The majority opinion departs from the faith of the fathers in this state, and wanders after foreign gods. It ceases to worship at the altar of Mississippi precedents, and bows the knee to Baal, Asteroth, and Moloch.

Instead of giving the individual the protection intended by section 17 of the Constitution of 1890, he is forced to bear the burden alone, or with a few others situated in the same way, for public improvements, real or fancied. Numbers of imaginary benefits, as well as some real ones, are paraded before the court as a justification for the decision we are asked to make in the present case, and argument made as to the calamitous consequences to the delta section of the state that will result from adhering to the construction adopted in *Vicksburg* v. *Herman,* 72 Miss. 211, 16 So 434, with such consummate ability by the distinguished jurists who then composed the court. It seems to me that a sufficient

reply to this line of argument is made by the Georgia court in *O'Connell* v. *Railway Co.*, 87 Ga. 246, 13 S. E. 489, 13 L. R. A. 394 27 Am. St. Rep. 257, where Judge LUMPKIN, in answering a similar argument, said:

"It was urged in the argument that the law ought to encourage the reclaiming and improvement of lands which are subject to injury from the natural action of floods and surface water; and it is surprising to find this argument unquestionably relied upon in many cases which are supposed to follow the common law of surface water. The error therein is easily exposed; for to the same extent as the land of an adjoining owner is damaged by the improvement on the defendant's land, so far exactly is the development of the damaged land set back and retarded. The defendant might bring his land to perfection for his uses, and then have all that good work ruined by the first measures of improvement adopted by his less progressive neighbor. The rule contended for by the defendant would be a poor encouragement to painstaking labor engaged in reclaiming unprofitable land. Every one is charged with notice of nature's operations, but who can tell when a man will build his bulwarks against the flood? There is no public policy to allow one landowner to improve his condition at the cost of his neighbor; but the improver must, at his peril, see to it that the benefit to himself is large enough to pay both him and his neighbor's damage, if any. The law does not look to the interest of one individual but recognizes and enforces the duties implied in his relation to others."

The majority opinion quotes from the supreme court of Arkansas, *McCoy* v. *Levee District*, 95 Ark. 345, 129 S. W. 1097, 29 L. R. A. (N. S.) 396. But Arkansas is lined up with that line of authorities which refuse to give any legal meaning to the words "or damaged" in the Constitution, but construe the Constitution with this

provision to mean in legal effect the same thing as the taking of property for public use.

The Texas case of *Ft. Worth Improvement District v. Ft. Worth,* 106 Tex. 148, 158 S. W. 164, 48 L. R. A. (N. S.) 994, goes exactly contrary to the Arkansas doctrine, and is in accord with the doctrine of this state for the past thirty years prior to the present announcement.

In *Bradbury* v. *Vandalia Levee & Drainage District,* 236 Ill. 36, 86 N. E. 163, 19 L. R. A. (N. S.) 991, 15 Ann. Cas. 904, the Illinois court held that a drainage district which constructs a levee along a river and from the river to the highlands in such a way as to obstruct the natural flow of the flood waters of the river and cast it back on the property farther up the stream is liable for the injury thereby caused where the Constitution provides that private property shall not be taken or damaged for public use without compensation. It is further held that a drainage district cannot escape liability for injury done by its improvement to lands lying out of its limits on the theory that it is an involuntary *quasi*-public corporation, not liable to respond in damages for any of its acts, where its organization depends upon a petition of those living within its limits, and the statute provides that lands lying within the district shall be liable for any and all damages which shall be sustained by any land lying above such district by the construction of its works.

In *Tidewater Ry. Co.* v. *Shartzer,* 107 Va. 562, 59 S. E. 407, 17 L. R. A. (N. S.) 1053, it was held that the word "damaged" as used in a constitutional provision, forbidding the enactment of a law whereby property shall be damaged for public use without just compensation, is not confined to acts which would give a cause of action if done by an individual. And, also, damages for diminution in

the market value of property, not taken, by smoke, noise, dust, and cinders arising from the proper, ordinary, and lawful operation of a railroad seeking a right of way, may be allowed the owner under provisions of a Constitution that the legislature shall not enact any law whereby private property shall be taken or damaged for public purposes without just compensation, and of a statute that damages shall be awarded which result from injuries to the property of any person from the construction and operation of the works. Appended to the report of this case in L. R. A. is a note on the right under constitutional provisions against damaging private property for public use without compensation, to compensation for consequential damages to property, no part of which is taken from smoke, noise, dust, etc., incident to ordinary operation of railroads. In this note there is a divergence of authority as to the recovery of consequential and indirect damages. But as shown in *Vicksburg* v. *Herman*, 72 Miss. 211, 16 So. 434, our court aligned itself with those cases holding that consequential and remote damages as well as direct damages may be recovered.

In *Railway* v. *Bloom*, 71 Miss. 247, 15 So. 72, it was held that section 17, Constitution of 1890, enlarges the previous rule on the subject, in that it provides that private property cannot be taken or damaged for public use except on due compensation first being made to the owner. It was held in that case that a railroad cannot escape liability, although it acquired its right of way prior to the adoption of the Constitution of 1890.

In *King* v. *Vicksburg Ry. & L. Co.*, 88 Miss. 456, 42 So. 204, 6 L. R. A. (N. S.) 1036, 117 Am. St. Rep. 749, it was held that section 17, Constitution of 1890, forbidding the taking or damaging of private property for public use, except on due compensation being first made to the owner in a manner to be prescribed by law, while primarily applicable to eminent domain proceedings, is

equally protective of the owner where his property is damaged by a public use without condemnation. That due compensation is what will make the owner whole pecuniarily for appropriating or injuring his property by any invasion of it cognizable by the senses, or by interference with some right in relation to property whereby its market value is lessened as the direct result of the public use. And it was held that the property owner could recover damages resulting from depreciation in the value of property caused by noise, smoke, soot, cinders, and the like, if sufficient to render its occupancy uncomfortable.

In *A. & V. Ry. Co.* v. *King*, 93 Miss. 379, 47 So. 857, 22 L. R. A. (N. S.) 603, it is held that, where a railroad company which to meet the demands of its increased traffic lays additional sidetracks on its right of way held under a charter authorizing it to acquire and use the same for all necessary railroad purposes, it is liable to the owner of buildings on contiguous land for damages thereto resulting from smoke and vibrations caused by the operation of trains on such side tracks, though the company acquired its right of way before such buildings were erected, and when the state Constitution forbade, not the damaging, but only the taking, of private property for public use without just compensation. See, also, the authorities cited under section 17, Constitution of 1890, in Hemingway's Code, upon the subject.

In *Miller & Lux* v. *Madera Canal & Irrigation Co.*, 155 Cal. 59, 99 Pac. 502, 22 L. R. A. (N. S.) 391, it was held that flood waters of a river which is annually swelled beyond its ordinary banks by climatic conditions at certain times of the year, except in unusual seasons, and which flow as the main body of the river, being confined by the conformation of the land, although without well-defined boundaries or visible banks, are part of the natural water course, and the rights of a riparian owner thereto cannot be invaded or interfered with by non-

riparian owners, to his injury. That a riparian owner is entitled to enjoin the diversion of flood waters of a river which annually flow over his land, bearing fertilizing material and irrigating it sufficiently to make it productive, whereas should the flow cease the land would become arid and greatly depreciate in value. It was also held that a riparian owner cannot be deprived of his right to the flow of the stream without compensation because its use by others will be more beneficial to the state.

In *Town of Jefferson* v. *Hicks*, 23 Okl. 684, 102 Pac. 79, 24 L. R. A. (N. S.) 214, it was held that the owner of lands situated upon a watercourse may construct an embankment thereon to protect his land from the superabundant water in times of flood; but in doing so he must so place the embankment that the natural and probable consequences of the embankment in times of ordinary floods will not be to cause the overflow to erode, destroy, or injure the lands of other proprietors upon the water course. It is also said in that opinion that an "ordinary flood" is one which, by the exercise of ordinary care and diligence in investigating the character and habits of the watercourse, might have been anticipated. It is also held that overflow waters that continue in a general course, although without defined banks, back into the watercourse from which they started or into another watercourse, do not become "surface waters," but remain a part of the watercourse. It is also held that an injunction would lie in equity to restrain the landowners on one side of a stream from maintaining a levee upon the bank thereof, whereby the flood waters of the stream are made to overflow unnaturally the land of others on the opposite side of the stream, without regard to the ability of the landowners who constructed the embankment to respond in damages. There is also a case note to this case in the L. R. A. report.

In *Walters* v. *Marshalltown*, 145 Iowa, 457, 120 N. W. 1046, 26 L. R. A. (N. S.) 199, it was held that to render

one liable for casting the flood waters of a river onto other riparian property by the erection of an embankment upon his own the amount of water upon the other property must be unduly as well as materially increased. In the case note to this case the editor in the L. R. A. series said:

"As was said in the note to *Jefferson* v. *Hicks,* 24 L. R. A. (N. S.) 214, it is undoubtedly the general rule that a riparian proprietor has no right to erect a levee or artificial bank along the margin of a stream, which will cause superabundant water, in time of ordinary floods, to flow upon or injure the lands of the opposite or other riparian proprietors."

See, also, the case note to *Avery* v. *Vermont Electric Co.,* 59 L. R. A. 876, under heading "Effect of Flood. Ordinary Freshets." See, also, *Keck* v. *Venghause,* 127 Iowa, 529, 103 N. W. 773, 4 Ann. Cas. 716.

Independent of the obstruction of natural watercourses by the levee in question, I think the appellants had no right to obstruct and divert the overflow water from Coldwater river in the manner shown by the facts in this case. See *Burwell* v. *Hobson,* 12 Grat. (Va.) 322, 65 Am. Dec. 247; *Uhl* v. *Railroad,* 56 W. Va. 494, 49 S. E. 378, 68 L. R. A. 138, 107 Am. St. Rep. 968, 3 Ann. Cas. 201; *Cairo R. R. Co.* v. *Breevort* (C. C.), 62 Fed. 129, 25 L. R. A. 527; *Fordham* v. *Railroad,* 30 Mont. 421, 76 Pac. 1040, 66 L. R. A. 556, 104 Am. St. Rep. 729; *Crawford* v. *Rambo,* 44 Ohio St. 282, 7 N. E. 429; *Wine* v. *Railroad,* 48 Mont. 200, 136 Pac. 387, 49 L. R. A. (N. S.) 711, Ann. Cas. 1915D, 1102; *West* v. *Taylor,* 16 Or. 165, 13 Pac. 665; *Wallace* v. *Drew,* 59 Barb. (N. Y.) 413; *C., B. & Q. R. R. Co.* v. *Emmert,* 53 Neb. 237, 73 N. W. 540, 68 Am. St. Rep. 602; *Clark* v. *Patapsco,* 144 N. C. 64, 56 S. E. 858, 119 Am. St. Rep. 931.

I regret to have been compelled to use language which appears rather strong in this dissent, and my dissent is in no sense the complaining of a disgruntled judge, but

is to be considered as a distress signal thrown out to the bar for help in preserving to the citizens of the state the protection of the Bill of Rights as understood by the constitutional convention and as interpreted by our distinguished predecessors. I cannot help feeling that the bar will be unable to advise a citizen as to his right in future cases, and the citizen is cast upon a troubled sea, with neither compass, rudder, nor polestar. In despair he may well exclaim:

"Alas for him who on the law's troubled deep
Floats idly, the sport of the tempestuous tide,
With no port to shield him, and no star to guide."

COOK, J., concurs in this dissent.